STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ARTHUR J. HUFF, DEFENDANT-APPELLANT.

Argued November 23, 1953—Decided January 4, 1954.

244

*Mr. Lewis S. Beers* argued the cause for appellant (*Mr. Joseph V. DeMasi,* attorney).

*Mr. Wilbur M. Rush,* Warren County Prosecutor, argued the cause for the State (*Mr. John H. Pursel,* on the brief).

The opinion of the court was delivered by

WACHENFELD, J. The defendant, Arthur J. Huff, was indicted for the murder of his wife, Ruth. The trial jury returned a verdict of guilty of murder in the first degree with a recommendation of life imprisonment. Upon the imposition of that sentence, the defendant appealed.

With the exception of the antecedent events, the facts are not greatly in dispute, although the inferences to be drawn therefrom vary to a considerable degree.

The family consisted of the husband and wife and three daughters, Janet 13, Joyce 14, and Shirley 16. Violence flared frequently in the many embittered conflicts between the defendant and the deceased prior to the event culminating in her death.

The murder occurred on January 25, 1953. About ten days prior thereto, in the presence of the two daughters, the defendant assaulted his wife, choking her while she was sitting in the living room, striking her with his fist, locked the door to prevent her leaving, and chased her around the first floor. When she finally escaped and was in the car with her two children attempting to leave, he tore out the ignition wires to prevent the use of the car. His wife and daughters fled and sought shelter elsewhere.

Choking his wife seems to have been common conduct, made more impressive by opening a penknife on one occasion and threatening her, saying, "I will get you right this time." The wife and daughters apparently thought it necessary to leave home quite often and go elsewhere for protection.

At another time one of the daughters ran from the house screaming for a neighbor to call the police, and there was testimony that the telephone wires in the home had been torn out by the defendant so a call for aid could not be made from there.

Most of the difficulty encountered was attributable to the wife's employment in a factory near Phillipsburg, which her husband had been insistent she give up. He was suspicious of her relations with male employees there, and the coolness

which he encountered on her part he imputed to the new interests and the environment associated with her employment.

Black and blue marks on the decedent's head, neck, and legs, exhibited more than once, were mutely symbolic of the violence she endured at the hands of an irate husband whose baseless pangs of jealousy rose quickly to destructive heights.

The decedent and two of her children fled from the house on January 15 and stayed away a number of days. They returned about six days before the wife was killed, but she was not alone in the house with her husband until January 25. The three daughters on that day had left the home prior to the wife's meeting her death at about 3 P. M.

From the police testimony, plus the husband's statement, it appears he chased his wife from her bedroom, through the hallway, to the top of the stairs, grabbed her from the rear by both shoulders or by the throat, put his knee in her back and pushed or shoved her down the stairs, her head hitting the telephone table at the bottom and breaking her neck, causing instantaneous death.

The defendant did not seek medical aid to establish the fact of death nor to attempt to prevent it. On the contrary, he dragged his wife's body through the first floor, down the cellar steps, dug a grave in the coal bin, and buried it there, covering it with coal. He cleaned up the blood, burned his wife's dress and buttons in the furnace, concealed her car keys on a sill in the garage, and put her rings, cross and chain in a tool chest in the garage and then reported to the police that his wife was missing.

On the 18th of March, the police, due to Huff's behavior, became suspicious and undertook a search of the home at 51 Jefferson Street. Noting the peculiar arrangement of the coal in the cellar, an officer borrowed a shovel and began digging beneath it, whereupon the defendant hurriedly fled from the premises. He went to a store in the neighborhood and there unsuccessfully tried to telephone his lawyer. While attempting to leave, he was apprehended by the police and taken to headquarters.

The defendant made a voluntary written statement in which he frankly admitted the original report to the police about his wife being missing was sheer fabrication. He described how she came to his bedroom on the day in question, while he was still partly asleep, for the purpose of getting her clothes to leave him, and "She was at the top of the stairs, and I grabbed her like this. I grabbed her from the back of the shoulder close to the neck. I pulled her back towards me. She twisted and knocked me off balance, throwing me back, and the next thing I knew she was falling down the stairs."

Although the confession does not include it, the police testified that the defendant, in re-enacting the crime, showed how he had placed his hands on his wife's shoulders and with his knee had shoved or pushed her down the stairs.

The defendant's attitude toward his victim is perhaps best portrayed by his actions and what took place, as outlined in his confession, after her death. He ripped off her clothes, violated her body in a most despicable and ghastly manner, too revolting to be reprinted here but detailed in his statement.

Other members of the family were away at the time of Ruth's death, and the State reasoned from this fact that the defendant planned to kill his wife and awaited the opportunity when no one else was in the house. The State proceeded upon the theory that the wife met her death at the foot of the steps as a result of the defendant's assault and his pushing her down the stairs, with intent to take her life.

The defense was a complete denial, the husband asserting death was accidental, involving no lethal weapon, and was merely an unfortunate incident.

Several assignments of error bear upon the sufficiency of the evidence, it being asserted no substantial basis can be found in the proofs for the finding of the mental state which is an ingredient of murder in the first degree.

While a juror was being examined on his *voir dire*, the following took place:

"Q. What is your religion? A. I am——
The Court: Pardon me; that I will not allow.
Q. Are you prejudiced in any way against Catholics?
The Court: That I will not allow."

And it is suggested this was error.

The defendant's counsel, however, abided by the ruling of the court, advanced no argument as to why this interrogation should be permitted, made no objection to the court's ruling, and then exercised a peremptory challenge which excused the juror from serving.

The propriety of questions asked on a *voir dire* of a juryman is in the discretion of the court, subject only to the essential demands of fairness and justice. *Rule* 1:10–1, now *R. R.* 1:5–1, provides that error in the denial by the court of any matters resting in its discretion shall be cause for reversal if specific objection was made thereto and it appears from the entire record that the defendant thereby suffered manifest wrong or injury.

No objection was made here, nor is there a showing within the definition of the rule. Moreover, the question is moot, the juror having been excused. Nevertheless, considered on its merits, the questions propounded were improper and had no place in the case being tried. *State v. Weiss*, 130 *N. J. L.* 149 (*Sup. Ct.* 1943), affirmed 131 *N. J. L.* 228 (*E. & A.* 1944).

When the State offered the defendant's confession in evidence, it was objected to and the question of its admissibility was therefore presented. The argument and the evidence concerning its admissibility took place in the presence of the jury.

The defense having consented to it, no complaint of this fact is made, but it is insisted that an injustice occurred because the court would not instruct the jury pursuant to the defendant's request that the matters related only to the admissibility and not to the truth or credibility of the statement made by the defendant.

It is discretionary with a judge, even over objection, to exclude the jury from the courtroom or to hear testimony

in their presence, and his action in exercising such discretion will not lead to a reversal unless it is shown there was an abuse of discretion resulting in manifest wrong or injury to the defendant. *State v. Fiumara*, 110 *N. J. L.* 164 (*E. & A.* 1933).

Under this rule there was no error in the court's disposition, in addition to which the court in its charge stated that the witnesses to the confession were offered to show it was made voluntarily and the jury should determine the truthfulness and the credibility of the confession itself.

It is next contended under three separate headings that the court erred in refusing the defendant's request for a verdict of acquittal in so far as the indictment referred to first-degree murder, second-degree murder, and manslaughter.

Assuming the motions to be for judgment of acquittal, *Rule* 2:7–7, now *R. R.* 3:7–6, we find little merit in them. The court will not grant a motion for judgment of acquittal if there is any legal evidence before the jury from which an inference of guilt can be legitimately drawn. *State v. Picciotti*, 12 *N. J.* 205 (1953).

Malice, anger and hatred can all be inferred from the testimony submitted, and it was for the jury to determine whether the killing was intentional, premeditated, and with malice aforethought. Once the killing has been proved, the law presumes it to have been founded upon malice until the contrary appears. *State v. Zupkosky*, 127 *N. J. L.* 218 (*E. & A.* 1941). The law infers malice from the commission of the wrongful act. *State v. Moynihan*, 93 *N. J. L.* 253 (*E. & A.* 1919). See *State v. Lederman*, 112 *N. J. L.* 366 (*E. & A.* 1933); *State v. Donohue*, 2 *N. J.* 381 (1949); *State v. Myers*, 7 *N. J.* 465 (1951).

If the design to kill is fully conceived and purposely executed, it is sufficient to sustain the conviction. *Donnelly v. State*, 26 *N. J. L.* 463 (*Sup. Ct.* 1857); *State v. Zupkosky, supra; State v. Cordasco*, 2 *N. J.* 189 (1949); *State v. Pierce*, 4 *N. J.* 252 (1950).

What actually occurred in the home on the date in question must be ascertained from the testimony, the husband's confession, and the legitimate inferences to be drawn therefrom. The police re-enactment graphically portrayed how the husband grabbed his wife by the throat, put his knee in her back and pushed her, and as a result she fell down the stairs. Was the amount of force with which she was hurled down the steps a substantial part in the resulting death? Was the jury justified in concluding that the accelerated propulsion was intended by the husband willfully and with malice designed to take his wife's life? Did the violation of her body and the venomous desecration of it spell out the defendant's homicidal intent before his wife's demise?

These suggested inquiries, under the evidence, were proper for the jury's consideration and determination, and there was ample testimony produced supporting the State's view. There was no error in the court's denial of the motions.

A psychologist whose qualifications were unquestioned was offered by the defendant, and after the preliminary foundation had been established, he was asked if he "arrived at any definite conclusion as to the mental age and the capability of this defendant." The State's objection to the question was sustained, and counsel argue it was offered "for the purpose of attempting to explain the burial and not for the purpose of reducing the chronological age from the defendant's 38 years to a mental age, thereby creating a presumption of the defendant's inability to commit a crime."

No objection appears in the record challenging the court's ruling and the matter is not therefore properly before us. Nevertheless, on the merits we find no error.

An adult's responsibility for a crime is not measured by a comparison of his mental ability with an infant's, but rather the test is his appreciation of the nature and the quality of his act and the difference between right and wrong in its commission. *State v. Schilling*, 95 *N. J. L.* 145 (*E. & A.* 1920); *State v. Ehlers*, 98 *N. J. L.* 236 (*E. & A.* 1922); *Commonwealth v. Stewart*, 255 *Mass.* 9, 151 *N. E.* 74

(*Sup. Jud. Ct.* 1926); *Patterson v. People,* 46 *Barb.* 625 (*N. Y.* 1866); *Fisher v. U. S.,* 328 *U. S.* 463, 66 *S. Ct.* 1318, 90 *L. Ed.* 1382 (*Sup. Ct.* 1946). Thus, the ruling of the court in this regard was beyond reproach.

██ Four photographs were introduced in evidence showing the body of the deceased in the grave and shortly after it had been removed therefrom. Two of these were in color and are the only ones objected to. It is suggested there was error in their admission because they were "secondary, unnecessary, irrelevant and incompetent" and were "gruesome" and "horrified and sickened those inspecting the photographs."

██ Photographs of unpleasant and gruesome aspects of a murder case are not objectionable for this reason alone, and their admission has frequently been sustained. *State v. Aeschbach,* 107 *N. J. L.* 433 (*E. & A.* 1931); *State v. Fine,* 110 *N. J. L.* 67 (*E. & A.* 1932); *State v. Burrell,* 112 *N. J. L.* 330 (*E. & A.* 1934); *State v. Heathcoat,* 119 *N. J. L.* 33 (*E. & A.* 1937).

In *State v. Myers, supra,* we held the mere fact the photographs were cumulative, since there was other testimony to establish the cause of action and identification of the victim, did not of itself render them inadmissible; while in the *Heathcoat* case, *supra,* the court, stressing the revolting phases of the pictures offered, said: "The admissibility of photographs under such circumstances is too well fortified to admit of doubt."

In the case *sub judice* the prosecutor had a definite lawful purpose in offering the photographs. He was endeavoring to connect up the evidence already recorded by showing "the discoloration of the left temple where apparently she fell." The defendant acknowledged the exhibits correctly represented the subject matter and his objection was "that this photograph in color creates a great prejudice in the minds of the jury and, secondly, they are not the best evidence."

We are not cognizant of any authority distinguishing color photographs from the standard black and white type, and we are unable to discern any logical reason why they should

not be used as evidence, subject to the same limitations and restrictions as already adjudicated as to the ones customarily used.

The defendant in a preliminary motion sought, amongst other things, a copy of the confession and a copy of the autopsy report. The trial court supplied him with a copy of the confession but denied him the report.

The matter was within the sound judicial discretion of the trial court and the record bespeaks no abuse warranting us in concluding otherwise. *State v. Tune*, 13 *N. J.* 203 (1953).

Next it is urged as a matter of law it cannot be said that the defendant here lay in wait to commit the murder which actually took place.

Other than a comment by the prosecutor, the record shows this matter never became an issue or was presented to the jury or charged by the court except for the reciting verbatim of the statute involved, which was standard procedure.

As a matter of law, it is proclaimed it cannot be said that the act of the defendant was one against the peace of this State, of which the probable consequences might be bloodshed. The defendant argues thusly: "Assuming, for the sake of argument, that the defendant did push his wife down the stairs, can it be said that the act was one of which the probable consequences might be bloodshed?"

We think the question embodies the obvious answer. The legitimate inferences from the proven facts were for the jury. It was so proceeded with and we see no error.

As to the reasons urged claiming error in refusing to grant a verdict of acquittal of first-degree murder, second-degree murder, and manslaughter at the end of the defendant's case, our views are the same as already expressed in the disposal of the same questions at the end of the State's case.

The court's charge, it is said, was favorable to the State and prejudicial to the defendant and was incomplete as it failed to instruct the jury on all the issues.

These reasons seem to be afterthoughts of the defendant's counsel. Certainly no such suggestions were made in com-

pliance with *Rule* 2:7–8(*b*), now *R. R.* 3:7–7(*b*). Even though the court pointedly inquired of counsel after its charge if there were any exceptions they cared to note, none was recorded as now advanced.

We have, however, carefully studied the court's full charge. We think it adequate, accurate, fair and complete. Factually it gave a concise resume of the evidence presented, including the defendant's denial in its various details, and carefully avoided trespassing upon the function specifically pre-empted to the jury. It meticulously defined the degrees of murder and the crime of manslaughter and instructed the jury it could return any of five different verdicts, including one of not guilty. It emphasized the burden of proof upon the State and fairly protected every constitutional right of the defendant. We think it was in accord with the finest concept of judicial trial obligations.

We cannot fathom the criticism directed at the court's charge that all unlawful homicides are presumed to be murder in the second degree. We are unable to discern it, but assuming merit in the thought, the defendant here was convicted of murder in the first degree, and the failure to charge correctly second-degree murder, under these circumstances, would be harmless error. *State v. Noel,* 102 *N. J. L.* 659 (*E. & A.* 1926) ; *State v. Martin,* 102 *N. J. L.* 388 (*E. & A.* 1926) ; *State v. DePaola,* 5 *N. J.* 1 (1950).

The court, it is said, erred in refusing the defendant's requests to charges Nos. 1, 2, 3, 4 and 5. No objection was registered as to the failure to do so and the court is not required to charge in the exact language requested provided the subject matter of the requests has been fully covered, nor has the defendant the right to choose the language in which the court should state the pertinent instructions he is entitled to. *State v. Tansimore,* 3 *N. J.* 516 (1950) ; *State v. Bunk,* 4 *N. J.* 461 (1950) ; *State v. DePaola, supra.*

The subject matters of the requests here were substantially covered in the court's charge to the jury.

The defendant next contends the verdict was contrary to the weight of the evidence as there was no testimony con-

cerning his intention to kill or even injure the deceased. The fact no weapon was used is stressed, as well as the failure of the medical testimony to corroborate the defendant's statement, which he subsequently denied, of the violations visited upon the body after death.

 The medical evidence in this regard is sketchy and incomplete, and the element of time and decomposition may have had some bearing not explained by the record. In any event, it constituted a jury question and was accurately presented by the court, including the medical phases, with full emphasis favorable to the defendant as contended for by his counsel.

 The mere fact that no weapon was used does not of itself exonerate the defendant. If the unlawful assault was committed and if the prosecution successfully carried the burden of proof beyond a reasonable doubt, as charged by the court below, "that the killing was willful, deliberate and premeditated killing as set forth in the statute * * *" the jury was justified and the evidence warranted it in returning the verdict it agreed upon.

 Rarely is the intent to take life proved by direct evidence. Such proof is usually circumstantial, furnished by the nature of the act, the conduct of the accused, and the full circumstances involved.

Here the gist of the evidence, both direct and circumstantial, including episodes before and after the death of the deceased, admitted and denied, produced a fabric of indisputable hate, malice and violence of long duration, culminating in a death properly classified as willful, deliberate and premeditated.

One short question in the defendant's statement and a brief, simple answer epitomized the accused's appraisal of his own conduct and its results, justly reflected in the jury's verdict:

"Q. Why did you bury her?
A. Because I knew I was the cause of her death and I wanted to hide the crime."

The verdict should not be set aside as against the weight of the evidence except where it clearly appears it is the result of mistake, passion, prejudice or partiality. *State v. Pierce, supra; State v. Goodman*, 9 *N. J.* 569 (1952); *State v. Peterson*, 10 *N. J.* 155 (1952).

The facts and circumstances here and the degree and kind of homicide committed were clearly for the jury. Their verdict conforms to our law and is substantiated and supported by the trial record.

Lastly, it is said the verdict was a nullity as the jury was improperly and illegally polled.

The jury returned first with an original verdict finding the defendant guilty of murder in the first degree with a recommendation of mercy. The court refused to accept it, re-instructed the jury, and returned them for further deliberation. Shortly thereafter, they returned with a verdict of guilty of murder in the first degree with a recommendation of life imprisonment.

After the verdict had been so recorded and announced to the jury, the court said:

"Members of the jury, the court will record your verdict as rendered, guilty of murder in the first degree with recommendation for life imprisonment. The jury will be polled. As each juror's name is polled, if such juror agrees with the verdict recorded, will you kindly respond 'I do.' If you do not agree with the verdict as it is recorded, then kindly respond that you do not agree. The verdict as recorded is guilty of murder in the first degree, with recommendation of life imprisonment."

Thereafter, the jury was polled and each juror, as his or her name was called, responded, "I do." This procedure is within our pronouncement in *State v. Myers, supra,* and *State v. Vaszorich*, 13 *N. J.* 99 (1953).

Finding no error in the record before us, the judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.