STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. THEODORE WALKER, DEFENDANT-APPELLANT.

Argued May 10, 1954—Decided May 31, 1954.

*Mr. Robert Queen* argued the cause for appellant (*Mr. Frank H. Wimberley* and *Mr. Isaac H. Nutter,* attorneys).

*Mr. Mario H. Volpe,* Mercer County Prosecutor, argued the cause for the State (*Mr. Frank H. Lawton,* First Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

WACHENFELD, J. Agonized screams of terror emitted by the victim as she resisted being tied, after having been robbed, assaulted and stabbed in her store in broad daylight, brought immediate response from a number of people in the neighborhood. Joined by vigilant police, they vigorously pursued the culprit as he fled through the public streets in an effort to escape. His capture and arrest were quickly accomplished.

Thus unfolded the crime of murder charged against the defendant, of which he was convicted and sentenced to death, his appeal being presently before us.

The facts are not complicated and most of them are not denied. On the morning of August 18, 1953, shortly before noon, Mollie Schlessinger was stabbed several times with a knife and otherwise bruised and injured in the course of a robbery. She was found on the floor behind a counter of her uniform shop at 27 North Montgomery Street, Trenton.

Howard R. Miller, a mail carrier, was about to enter the premises in question when he heard screams, "He's killing me. He's killing me." As he proceeded to the rear, he saw a big man answering the defendant's general description come out from behind the counter and run out of the door. Miller shouted, "Stop that man," and went to the rear of the counter, where the victim was lying on the floor near the cash register. Nearby he found two $10 bills and one $5 bill.

William Boyd testified that he and his wife were about to enter the shop in question to purchase a uniform. When almost at the entrance he saw a man "burst out of the door" and heard a woman scream. Boyd likewise shouted, "Stop that man, stop that man, robbery," and gave chase. The witness pursued the defendant east on Hanover Street and other people joined him in the chase. He identified the defendant as the man he saw come out of the store.

Frank Ernie conducted a business three stores from the uniform shop and heard the victim scream twice and hurried to her store. He saw the defendant run out of the shop with Boyd pursuing him. At the trial he identified Walker and the clothing worn by him at the time. Walker ran east on Hanover Street to North Stockton Street, where he entered an alleyway separating two buildings. The witness entered a police car and went to the Coalport railroad yard opposite the freeway entrance on Perry Street, where he saw the defendant in the custody of Patrolman Dennis Furman.

Anthony J. Salvatore was driving his truck north on Montgomery Street at about the time in question. While waiting for a traffic light at the intersection of East Hanover Street, he heard the victim's screams coming from the uniform shop and saw the defendant "dash out" of the store.

He also joined in the hunt and saw Walker apprehended at the Coalport yard.

Dean R. Ewell and Robert S. Wolensky told of their attempts to overtake Walker, while Mrs. Ethel Miller and Mrs. Mary Thompson corroborated the testimony of others regarding the defendant's attempts to conceal himself under an automobile in a yard on Perry Street.

Patrolman Dennis Furman saw Walker "dive" under a railroad-flat car at the Coalport yards and placed him under arrest. He identified the defendant, searched him and found a woman's red purse in his right-hand trouser pocket. This purse contained, amongst other things, ladies' items and two sets of keys, Exhibits S–33 and S–34, which were identified as keys to the victim's store and apartment by her sister, Harriet S. Wilgarde.

Officer Lewis Hill testified he found a knife, Exhibit S–27, on the day of the crime in a vacant lot at the rear of 125 North Stockton Street on the route taken by the defendant while in flight; while Hazel Goodson, mother-in-law of Walker, identified the same knife as one she had given to her daughter when she married the defendant.

After the attack the victim was taken by police ambulance to St. Francis' Hospital. She was unconscious and suffering from a state of shock due to hemorrhages caused by the wounds "sustained by the patient in both hands and in the left thigh." There were "lacerations across the palm and across the left index finger almost severing this finger." On the right hand there was a lacerated wound across the palm and in the middle part of the right thumb. There was a laceration on the chin and a deep stab wound in the left thigh. She had multiple lacerations, abrasions and contusions all over her body, including her right breast and right shoulder.

Surgery was resorted to, and following the operation Mollie Schlessinger regained consciousness and was interviewed by the police authorities. She expired at about 7 p. m. on the following evening. Death was caused by traumatic shock induced by total loss of blood, which was a direct result

of the stab wound inflicted. Before her death she identified Walker as her assailant.

Two statements were taken from the defendant, Exhibit S-51, relating entirely to robbery and taken before the victim died, and Exhibit S-52, the same type of confession, relating, however, to murder and made after the death of the victim. These will again be referred to under the point questioning their admissibility.

The defendant was indicted in the statutory form for murder, and the trial was predicated upon the theory that the death occurred in the commission of the robbery as already detailed. The jury brought in a verdict of guilty of murder in the first degree, with no recommendation, resulting in the defendant's being sentenced to death.

On appeal five points in all are made. The first is combined with the second and they refer to Exhibit S-51, the confession relating to robbery, taken before the victim's death, and Exhibit S-52, the confession referring to murder, taken after the victim died.

Neither should have been admitted, it is contended, because they were not voluntary. The gist of the argument is that while on the way to the police station the defendant was "maltreated by the police officers, struck on the head with a blackjack and then they threatened to arrest his wife. They offered to speak a good word for him to the judge if he would be cooperative," and "at the time of questioning he was surrounded by four law enforcement officers, one of whom questioned him and another wrote the answers."

The testimony in reference to the defendant's being struck or maltreated by the police officers is emphatically denied by the officers charged therewith, and thus became a question of fact to be decided by the jury. This type of objection has been ruled upon many times in numerous cases. The test is whether the confession, under the given circumstances, was voluntarily made. Its competency is primarily for the trial judge, and the weight to be given it is determined by the jury. The determination of the trial court will not ordinarily be disturbed on appeal where there is sufficient

evidence to support it. *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1948); *State v. Auld,* 2 *N. J.* 426, 435 (1949); *State v. Pierce,* 4 *N. J.* 252 (1950); *State v. Cooper,* 10 *N. J.* 532 (1952); *State v. Grillo,* 11 *N. J.* 173 (1952), and many others.

■ Not only did the police categorically deny the use of pressure or force upon the defendant, but every indicia of spontaneity and truth in the confession is impressively evident. The verification of the offense was unusual; there were many witnesses identifying the defendant, and what occurred in the commission thereof is not even disputed. The undenied physical facts firmly corroborate the defendant's statement and there is not the remotest doubt of the facts or of the defendant's guilt. In Exhibit S–52 he said:

"I sat there and looked at the newspaper. Then I got the knife and the cord to go rob this store. I planned how I was going to do it. I was going to scare her with the knife, tie her up and gag her and get the money out of the safe. I parked the car on Hanover Street a block away and walked to the corner and I got my nerve up and I asked her for a uniform, size 16. She turned her back, I grabbed her and one hand over her mouth and told her I wanted the money. I pulled her to the back of the store, put her on the floor, tried to tie her up. She told me the money is over there (pointing to the cash register) and I dragged her to the cash register, reached in the cash register and took the money out, put it in my pocket. Tried to tie her up, so I could get in the safe, and the mail man came in. That is where I started cutting her. I don't know if she was chasing me that made me cut her or if I was scared, then I ran. I ran down Hanover Street, across a parking lot, thru a alley, over a fence, in another lot, underneath a car. Two women saw me under the car. I got up and ran again, across Perry Street, over a car into a lot under the train. The cop caught me."

The knife used was "a wooden handle butcher knife, overall length 12½ inches, 4½ inch wooden handle, blade length 8 inches."

The proof and corroboration are replete and abundant. The defendant's contention that his statement was a result of duress is strenuously denied. Furthermore, all the material aspects of the crime suggested in the confession were independently proven and confirmed as true. They were not

denied by the defendant, who did not take the stand in his own defense except as to the limited phase of the trial in reference to the admissibility of the confesions in question, and this out of the presence of the jury.

Whether a statement is voluntary depends upon the facts in each case, and in the instant matter we are convinced there was no violation of the rule of fundamental fairness as commented on at length in *State v. Pierce, supra,* where many of the state and federal cases are marshalled and analyzed.

The confessions here, we think, were freely and voluntarily given, uninduced either by hope or fear or other considerations leading to the substitution of something else than the truth.

The court amply protected the defendant's rights and charged fully and accurately in reference to the confessions. It said:

"It is the fundamental law of our State before a confession can have any force or effect against the defendant it must appear that it was freely, voluntarily and understandingly given, and given without any promise of reward or benefit. On the basis of a preliminary finding by this Court, in your absence, that the confessions and admissions were the voluntary acts of the accused, they were allowed in evidence; however, the ultimate and final determination on this issue is for you. If you find in your deliberations they were not voluntary, then you must discard them and give them no consideration whatever. If, however, you find that they were voluntary, then you will pass to a determination of their truth. So much of their contents as you may find to be the truth you will consider along with all the other evidence in the case in reaching your verdict as to the guilt or innocence of the defendant."

There was no error in their admission.

 The third point alleges error in that the charge to the jury "contained inadequate, outmoded and confusing instructions as to the defense of insanity interposed to the manifest wrong and injury" of the accused, "in that it did not define the various kinds and degrees of insanity." The brief lists a variety of mental derangements which the writer classifies as insanity, and it is said the jury, "in considering the question of insanity, are entitled to know, if possible,

what are some of the other forms and degrees of mental disease in order that they might decide with some degree of accuracy, if the defendant is not suffering from one or more of them."

The absurdity of the suggestion made is quite obvious. There is no proof in the present case that the defendant was suffering from any form of insanity; consequently it would have been inconsistent and improper for the court to have charged with reference to something that did not exist according to the record.

The impact of the plea of insanity in a murder case has been fully explored and determined in *State v. Cordasco*, 2 *N. J.* 189 (1949), and recently in *State v. Huff*, 14 *N. J.* 240 (1954). We find no violation here of the principles there enunciated.

We have examined with care the full context of the court's charge to the jury in reference to insanity and think it complete, fair and factually and legally adequate.

Under Point 4 it is urged that the court erred in failing to provide a preliminary hearing on the issue of insanity.

Although it is not charged as error, counsel calls attention to the fact that at the beginning of the case a motion was made and denied to withdraw the defendant's previous plea and enter a plea of not guilty because of insanity. It is contended that the application was sufficient to apprise the court "of the mental condition of the defendant before his trial opened" and the court therefore "erred in failing to provide a preliminary hearing on this issue, entitling the defendant to a reversal of the verdict against him."

Firstly as to the motion to change the plea, we think it should have been granted, but its *pro forma* denial was not prejudicial because the trial court then proceeded as if it had been allowed and instructed the jury that the defense of insanity had been interposed: "Insanity as a defense has been set up in this case."

It then charged fully on the law of insanity and amongst other things said:

"Under the circumstances, it becomes necessary for me to advise you with respect to the law of insanity in so far as it relates to the responsibility of a person for the commission of crime."

The remainder of the court's instructions on insanity at length followed and has already been discussed and disposed of under Point 3.

Consistent with the admission of insanity as a defense, the court specifically charged the jury:

"If you should find that at the time this alleged crime was committed, the defendant was insane to the extent that I have instructed you previously in this charge, as you may discover from the facts in the case, it will be necessary for you to find specially by your verdict whether or not this defendant was insane at the time of the commission of the offense charged in this indictment, and to declare whether or not such person is acquitted by you, the defendant, by reason of the insanity of the defendant, at the time of the commission of such offense, and to find specially by your verdict also whether or not such insanity continues."

██ The defendant now argues there should have been a preliminary inquiry into the accused's mental status at the time of trial to determine if he was then *non compos mentis*. But a plea of not guilty on the ground of insanity puts in question the mental condition of the defendant at the time of the commission of the crime and not at the time of trial. The inquiry contemplated by *N. J. S.* 2*A*:163–2 goes to the mental condition at the time of the hearing, although a determination may also be made as to sanity of the accused at the time of the offense charged. But the statute is specific in the requirement of an "application" for such an inquiry, which must be presented to the court. No such application having been made, there was no occasion to institute an inquiry.

Additionally, the record is barren of any basis whatever for the conclusion that the accused was bereft of reason either at the time of the robbery or at the time of trial.

Further light was shed upon the failure of the defendant to substantiate the defense of insanity on the State's motion to strike the testimony of many witnesses relating to the

defendant's family background and certain episodes in the defendant's career, permitted presumably as a foundation to establish insanity when subsequently connected up with that defense.

Two incidents of interest occurred. The court denied the State's motion to strike but pointedly indicated to defendant's counsel: "There has been no opinion expressed to the mental state of this man by anybody, lay or medical." The prosecutor then offered to defense counsel "any information" that the State had "dealing with the mental competency of this defendant. * * * There is nothing that we want to withhold."

Despite the admonition of the court and the cooperative offer of the prosecutor, nothing appears of record; nor was anything supplied buttressing the only suggestion of defense the accused had, that of insanity. Under these circumstances there is nothing in the evidence supporting the thought of error for failure to inquire into the defendant's mental status.

Point 5, asserting the verdict was against the weight of the evidence if the confessions were improperly received, is not supported by the substance of the brief, nor is the issue argued thereunder. It was specifically abandoned by the defendant on oral argument of the cause. No other course of action was open to counsel, as the record is laden with abundant convincing testimony dispelling any shadow of doubt as to the accused's guilt.

The judgment of conviction below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.