STATE, Respondent v. VIOLETT, Appellant

(111 N.W.2d 598)

(File No. 9872. Opinion filed November 7, 1961)

294

**W. A. McCullen, Joseph M. Butler,** Rapid City, for Defendant-Appellant.

**A. C. Miller,** Atty. Gen., **Robert D. Hofer,** Asst. Atty. Gen., **James Wilson,** State's Atty., Rapid City, for Plaintiff-Respondent.

ROBERTS, J. Defendant was found guilty by a jury on October 26, 1959, of manslaughter in the first degree. By a judgment entered November 4, 1959, he was sentenced by the court.

A preliminary hearing was held July 21, 1954. Defendant was represented by court appointed counsel. He was bound over for trial to the circuit court. An information filed by the state's attorney on November 2, 1954, contains two counts. In substance the first count charges that defendant on the 12th day of June, 1954, on the Shull ranch in Pennington County, did wilfully and unlawfully with malice aforethought shoot and mortally wound Richard Deutscher and inflicted upon said person mortal wounds from which he died. Count two of the information charges that the mortal wound of which Richard Deutscher died was inflicted by a bullet from a .22 caliber rifle discharged by defendant, without any design to effect death, while defendant was engaged in committing the crime of robbery.

The state's attorney prior to the filing of the information and arraignment in circuit court requested the appointment of experts to inquire into the sanity of the defendant. The superintendent of the Yankton State Hospital and two physicians on the staff of that institution were appointed to examine defendant. Their written report, filed with the Clerk of Courts of Pennington County on November 2, 1954, stated in part: "Staff unanimously agreed upon a diagnosis of schizophrenic reaction, catatonic type. We are certain that this condition not only exists now

but existed at the time of the crime. We are also certain this individual has been actively schizophrenic for a year or two. In fact, he can be said to have been slowly slipping into schizophrenia most of his life."

On November 15, 1954, the circuit court conducted a hearing and testimony was taken before a jury impaneled to determine whether or not defendant was sufficiently sane to stand trial. The court at the conclusion of the hearing entered the following order: "The jury having by its verdict found that the defendant is not of sufficient sanity to now be held for trial, and it appearing to the satisfaction of the court that it may be dangerous to the public health and safety to release or discharge the defendant during the time of his present mental condition and insanity, it is the order of the court that Robert Allen Violett be committed to the State Hospital for the Insane at Yankton, South Dakota, until such time as the defendant becomes sane, at which time the Superintendent of the State Hospital for the Insane shall forthwith place the defendant in the custody of the sheriff of Pennington County, South Dakota, to be by them held for trial on the charge in the information filed against him."

The defendant was confined in the Yankton State Hospital until September, 1959. Counsel for defendant moved dismissal of the information and discharge of the defendant on the ground that he had been deprived of his right to a speedy trial. The motion was overruled and on October 19, 1959, the case proceeded to trial before a jury. The record shows that defendant on being arraigned stood mute, and the court then entered a plea of not guilty for him and also a plea of not guilty by reason of insanity.

A review of the record shows that defendant arrived in the town of Wasta, Pennington County, in an automobile on June 9, 1954. Jack Tennyson who was employed at a sand pit about two miles from Wasta related a conversation with defendant in the afternoon of that day. The witness testified: "Well, when he first got there he was looking for a job, he told us he ran out of gas with his car, and he

was supposed to have had a job in Yellowstone Park. He had just about enough money to make it there, and he had been messing around in the Bad Lands, never been through there before, he lost his billfold, he got as far as Wasta, wanted to get a job, make enough money to get on out to Yellowstone. He asked us if there was any openings there, and we told him we didn't know, that he would have to wait and see the foreman, so when the foreman came back there was no opening. He had said that they in town had told him that he probably could get a job at the Roy Shull ranch, and he knew the general direction, he was going to wade the river and go on into the ranch."

Defendant then proceeded in the direction of the Shull ranch and on the way met Lawrence Kalkbrenner who was working in a field. Mr. Kalkbrenner testified: "This man walked up, he was walking, he was going south, and as I stopped to see if there was something he wanted, he asked me if he was on Roy Shull's ranch. I told him that he wasn't quite there yet, and he asked me how to get there, so I pointed out the place, and then made a statement that he was dry, about hadn't had a drink for awhile, asked me if I had any water. I said I didn't, didn't take any along that day. I suggested he sit down and rest and smoke a cigarette. He said he didn't have any cigarettes, so I give him mine, what I had, and then he asked if what I had in the radiator, if I could give him a drink, what I had in the radiator. I told him I thought he would get sick. He then asked what I had in the tires. I again told him he would get sick if he drank that."

Richard Deutscher, wife and three children resided on the Shull ranch. He was the son-in-law of Roy Shull whose home was in Wall, a distance of ten miles from the ranch. When Mr. Shull arrived the evening of June 9 at the ranch, the defendant identified himself as Joe Finch and said that he was without a place to eat or sleep and asked if he could work on the ranch. The Deutscher family at the time had gone to Sturgis. That night defendant stayed at the Shull home in Wall and the following morning, Thursday,

returned with Mr. Shull to the ranch. Defendant likewise returned with Mr. Shull to the ranch the following Friday and Saturday mornings. It appears that deceased, Richard Deutscher, in the afternoon of the day of the shooting, was in the basement of his home repairing a water pump. Mrs. Deutscher was in the kitchen and within hearing distance. She testified: "Mr. Violett asked Richard if he wasn't done yet * * * and I then heard Richard answer him and say, 'No, it's going to take a long time' * * * Well, the next thing I heard was a loud noise, * * * I * * * went to the basement. When I stepped off the foot of the stairs I saw my husband lying on his face. Mr. Violett was standing back to one side of the stairs with a gun on me. * * * I asked him why, he said my husband wouldn't give him any money. * * * He asked me for the keys to the Mercury * * * I told him I didn't have the keys." She further testified that defendant then searched the body, found and took the keys and deceased's billfold. Statements made by defendant following his arrest were to the effect that the shooting was accidental, but otherwise are in substantial agreement with the testimony of the wife as to what occurred at the time.

Errors are assigned to the effect (1) that defendant was denied his right to a speedy trial; (2) that the court should have conducted another sanity hearing before commencement of the trial; (3) that the court erred in discharging one of the regularly impaneled jurors and substituting an alternate juror; (4) that the court should have declared a mistrial because of the emotional displays of certain witnesses; (5) that the court erred in failing to instruct on the burden of proving sanity; and (6) that the evidence was not sufficient to justify the jury in concluding that defendant was sane at the time of the commission of the alleged offense, that the killing was perpetrated in the heat of passion with premeditated design and that the killing was perpetrated while defendant was engaged in the commission of a felony.

Defendant contends that his constitutional and statutory right to a speedy trial was violated. This con-

tention is based upon Section 7, Art. VI of the Constitution of this state guaranteeing to an accused the right "to a speedy public trial," and the same provision contained in SDC 1960 Supp. 34.2905. The term "speedy trial" as used therein is not precise or definite. Whether such a trial is afforded must be determined in the light of the circumstances of each particular case. State v. Werner, 78 S.D. 562, 105 N.W.2d 668. The lapse of time is not the only factor to be considered. It is sometimes said that a speedy trial means a trial regulated by fixed rules of law and that delay created by operation of those rules is not included in the meaning of the constitutional provisions. Accordingly, this court has held that the state is entitled to a reasonable time in which to secure the attendance of witnesses. State v. Pratt, 20 S.D. 440, 107 N.W. 538, 11 Ann. Cas. 1049. The right should not operate to deprive the state of a reasonable opportunity of fairly prosecuting criminal actions. The court in Beavers v. Haubert, 198 U.S. 77, 25 S.Ct. 573, 576, 49 L.Ed. 950, said: "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice."

In State v. Lamphere, 20 S.D. 98, 104 N.W. 1038, 1040, it was claimed that the trial court erred in denying a motion to dismiss an indictment on the ground of unreasonable delay. The accused at no time resisted the several continuances of his case resulting from adjournment of terms or demanded a trial. This court said: "The Bill of Rights provides that in all criminal prosecutions the accused shall have the right 'to a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed.' * * * As to what constitutes a speedy trial, and what action must be taken by the accused to avail himself of the right to a dismissal because of delay, the authorities are conflicting. Except in so far as statutes may otherwise require, we think the rule should be that a demand for trial, resistance to postponement, or some other effort to secure a speedy trial on the part of the accused, should be shown to entitle him

to a discharge on the ground of delay." This rule is followed in the majority of states and in the federal courts. 22A C.J.S. Criminal Law § 469; Annotations in 118 A.L.R. 1037, 129 A.L.R. 572 and 57 A.L.R.2d 302.

The reasons for the rule are thus stated in State v. McTague, 173 Minn. 153, 216 N.W. 787, 788, a frequently cited case: "The constitutional and statutory provisions for a speedy trial are for the protection of the defendant, but that does not mean that the state is the only one that may initiate action. There is really no reason for the courts to free an accused simply because a dilatory prosecutor has 'gone to sleep at the switch' * * * while the defendant and his counsel rest in silence. We hold that these solicitous provisions are not to be used as offensive weapons, but are for the benefit of defendants who claim their protection. * * * There is no just reason why an accused should not demand a trial, resist a postponement, or take some action indicating to the court that he believes he is being deprived of his statutory or constitutional rights as a foundation for his application for a dismissal. The right to a speedy trial is valuable, and it will be zealously guarded by the courts with resolute courage. It is for the protection of personal rights, not to embarrass the administration of the criminal law nor to defeat public justice. It is a privilege to the accused. If he does not claim it, he should not complain."

In some states as indicated in the Lamphere case courts hold that the burden of proceeding is on the state and that resistance to postponement or affirmative action on the part of the accused is not necessary to entitle him to discharge because of delay. Constitutional rights including those in the Bill of Rights may be waived by a defendant. State v. Ross, 47 S.D. 188, 197 N.W. 234. We adhere to the view that a defendant waives his right to a speedy trial under the constitution and statutes in aid thereof if he does not resist postponement or move to bring his case on for trial.

The jury in the insanity inquiry conducted in November, 1954, found the fact to be that defendant did not

have sufficient mental competence to undertake his defense if placed on trial. It is now claimed that the superintendent of the state hospital for the insane at Yankton indicated to the officials of Pennington County in April, 1956, that defendant was sufficiently competent to stand trial; that notwithstanding the order of the court and the provisions of SDC 1960 Supp. 34.2006 directing that a prisoner when no longer insane be returned for trial, without delay, defendant was not returned to Pennington County until September, 1959; that medical experts who had originally examined defendant were not available as witnesses at the time of trial because of such delay; that defendant repeatedly requested the superintendent of the state hospital for the insane to return him for trial; and that the delay resulted in serious prejudice to defendant.

■ The delay occasioned by the mental incompetence of accused to stand trial may have resulted as he contends in prejudice to him. Unless there was more delay than was reasonably attributable to mental incompetency to stand trial, the delay was consistent with the ordinary processes of justice and would not entitle accused to discharge. Beavers v. Haubert, supra. Aside from a question of waiver of the right to a speedy trial by failing to demand of the court before which his case was pending an immediate trial and in which action he was at all times represented by able counsel, we are not impressed with the argument that the record discloses that there was an unreasonable delay that was not a direct or indirect consequence of mental incompetency in returning accused to Pennington County for trial. SDC 1960 Supp. 34.2006 to which we have referred provides: "When the defendant becomes sane, the Superintendent of the Hospital must, without delay, place him in the proper custody until he be brought to trial or judgment, as the case may be, or be legally discharged." A delegation of discretion in the superintendent is reasonably essential to the administration of the statute. The record contains copies of reports of examinations of defendant by the superintendent and members of his staff and of correspondence between the superintendent and the sheriff and

state's attorney of Pennington County with regard to the return of defendant for trial. In a letter addressed to the state's attorney and dated April 27, 1956, the superintendent concluded: "However, in view of the circumstances, conflicting opinions etc., I am led to believe that we should forego any action at this time, keep Mr. Violett here, and wait further developments." The record does not indicate that the discretionary power vested in the superintendent was arbitrarily or capriciously exercised. We hold that in the light of the foregoing defendant was not denied a speedy trial.

Counsel for defendant did not move the court to conduct another sanity inquiry before commencement of the trial. However, they made motions in arrest of judgment and for new trial assigning as one of the reasons therefor that the record as to the mental condition of the defendant was such as to have made it an abuse of discretion for the court on its own initiative to have failed to suspend the trial, impanel a jury for the specific purpose and submit the question of the present sanity of the defendant.

■ The duty imposed upon the trial court by the statute is not conditioned on a request of the defense for a hearing on the issue of present sanity. It has been pointed out by this court that the doubt justifying the impaneling of a jury to try such issue must arise in the mind of the trial judge from the facts and circumstances; that sanity within the contemplation of this statute is tested by appraising the present ability of the accused to so understand the nature and purpose of the proceedings taken against him as to be able to conduct a rational defense; and that in the absence of showing to the contrary it must be presumed that the discretionary power of the trial court was properly exercised. Magenton v. State, 76 S.D. 512, 81 N.W.2d 894. The record shows that the superintendent of the hospital for the insane in the performance of a statutory duty vested in him had recently released custody of the defendant to the sheriff of Pennington County for trial indicating that in the opinion of the superintendent

defendant was at the time sane. The trial court did not abuse its discretion in not ordering prior to trial another determination of present sanity.

SDC 1960 Supp. 34.3607 provides that the court in a criminal action may direct the calling of one or two additional jurors to be known as "alternate jurors" having the same qualifications as the regular jurors and who shall attend at all times on the trial with the other jurors. The provisions of this statute which are here in question read: "If, before the final submission of the case, a juror or alternate or a member of his immediate family die, or if he or a member of his immediate family becomes ill or overcome by disaster as in the opinion of the trial Judge to render him unable or unfit to perform his duty the Court may order him discharged and if he be a regular juror, draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors."

Two alternate jurors were duly impaneled and sworn as provided by this statute. Before conclusion of the introduction of evidence, the state's attorney brought to the attention of the court that a member of the jury contacted him by telephone relative to a warrant issued in an adjoining county for the arrest of the juror. A motion by defense counsel for a mistrial was denied. The juror was dismissed and one of the alternate jurors, selected by lot, was substituted and the trial continued.

Counsel contend that the limitation in the statute upon the power of the court to substitute an alternate for a regular juror must be construed to mean that there can be a substitution in no other instance. The contention appears to be that there being good and sufficient cause to dismiss the juror the court under the circumstance should have declared a mistrial. In an opinion in People v. Howard, 211 Cal. 322, 295 P. 333, 334, 71 A.L.R. 1385, superseding an opinion in the same case reported in Cal., 289 P. 830, 70

A.L.R. 182, the court considering the effect of the substitution of an alternate for a regular juror under a like statute said: "While the circumstances of this case are not such as to bring it within the purview of section 1089 of the Penal Code providing for alternate jurors, we think the procedure by which the alternate juror was substituted in the place and stead of the regular juror was, at most, but an irregularity which in no way substantially affected the defendant's rights. in the execution of the means which the lawmakers provide to enforce the guaranties of the organic law, the end to be effected must be through the adoption of a reasonable and practical method to secure attainable ends. When this has been done, nothing more can be demanded, from the very nature of things. It is not claimed that the verdict would have been any different had the alternate juror not participated in the deliberations of the jury. He was subject to the same challenge and took the same oath as the other jurors. We should assume that in all respects he obeyed his oath and that he well and truly tried all the matters in issue and rendered a true and impartial verdict in the cause. Defendant's right was to a fair and impartial jury, not to a jury composed of any particular individuals." See also State v. Dalton, 206 N.C. 507, 174 S.E. 422; State v. Leatherwood, 26 N.M. 506, 194 P. 600; Application of Devlin, 139 Cal.App.2d 810, 294 P.2d 466; People v. Tinnin, 136 Cal.App. 301, 28 P.2d 951; People v. Mitchell, 266 N.Y. 15, 193 N.E. 445, 96 A.L.R. 791.

In the manner regulated by statute twelve jurors participated herein in the rendition of the verdict. Each was duly selected and accepted and heard all the evidence, arguments of counsel and the charge of the court. While dismissal of the juror and substitution of the alternate was not within the purview of Section 34.3607, supra, and constituted a procedural error as the court points out in the People v. Howard case, it was not prejudicial and ground for reversal.

There is no basis for the contention of counsel that the court erred in denying a mistrial or new trial on ground of manifestation of emotion by witnesses in the presence of the jury. The transcript indicates that the widow of Richard Deutscher while testifying as to the details of the shooting wept. It also appears that Mrs. Roy Shull when assisted from the witness stand fainted. A recess was taken at which time defense counsel moved for a mistrial contending that these incidents would naturally and inevitably create in the minds of the jurors a feeling of prejudice against the defendant.

██ ██ The question whether the conduct of a party weeping, fainting and exclaiming before the jury is ground for mistrial or new trial was considered in Poe v. Arch, 26 S.D. 291, 128 N.W. 166. This court observed that a trial judge does not sit upon the bench as a silent and passive spectator of what is going on, but sits to administer the law and guide the proceedings before him and concluded that this court on appeal should not interpose to control the exercise of such discretion unless there has been an abuse thereof. Cases dealing with the problem hold generally that it is for the trial judge to determine, in his discretion, whether manifestations of emotion by a party or witness is of such a nature as to preclude the proper and impartial consideration of the case by the jury. 53 Am.Jur., Trial, § 41; 66 C.J.S. New Trial § 35; 88 C.J.S. Trial § 52. We would not be warranted in holding that discretion was not properly exercised under the facts and circumstances of this case.

██ ██ It is contended that the trial court erred in not giving a requested instruction which would have told the jury that the burden of proving that defendant was sane at the time of the alleged offense rested on the state. The rebuttable presumption is that an accused is sane and was sane at the time an alleged crime was committed. State v. Faulk, 22 S.D. 183, 116 N.W. 72; Magenton v. State, supra. A plea of insanity is not of itself sufficient to rebut such presumption and it is not necessary for the state in

the first instance to prove the sanity of the accused. In other words this presumption of sanity and criminal responsibility serves and stands in the place of evidence in the absence of evidence to the contrary. It was not error to refuse the instruction requested.

We now come to a consideration of the contention that the verdict is not supported by the evidence. Counsel contend that evidence introduced tended to prove insanity and that the same was sufficient to dissipate the presumption of sanity; that it was then the burden of the state to prove sanity beyond a reasonable doubt, like any other fact, as a part of the state's case; and that in the absence of any evidence on the part of the state to show mental capacity at the time of the commission of the offense a verdict of acquittal should have been directed.

■■■ The "right and wrong" test of criminal responsibility as established in the M'Naghten Case, 8 English Reprint 718, followed in most jurisdictions, has been in substance re-enacted by statute in this state. Magenton v. State, supra; see annotation in 45 A.L.R.2d 1447. SDC 13.0201 provides: "All persons are capable of committing crimes except those belonging to the following classes: * * * (4) Lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness." The test of responsibility for crime under this statute was discussed in the case of State v. Leehman, 2 S.D. 171, 49 N.W. 3, 5, wherein it is said: "Insanity is not a legal term. In law books and in judicial opinions it is used in its popular sense, and signifies an unsoundness of mind—a derangement of the intellect. It may be complete or partial. Insanity is not always and necessarily a defense to a charge of crime. Whether it excuses from responsibility or absolves from guilt depends upon its degree. * * * In most of the states the test is whether a man has sufficient capacity and reason to enable him to distinguish between right and wrong; whether he

is conscious that the act he is doing, or is about to do, is a wrong and forbidden act, and one that he ought not to do. * * * The witness had testified that in his opinion defendant was at certain times and under certain circumstances 'irrational.' The object of the direct testimony was to show that defendant was not responsible for his acts, but that, as we have already seen, would depend upon the degree or extent of his irrationality. The excusing degree would be incapacity to distinguish right from wrong, and so the witness was very properly asked in cross-examination, if, in his opinion, the irrationality that he had testified to was of such character or extent as to incapacitate the defendant from knowing right from wrong. To have disallowed this question would have been to disallow the only test by which it could be determined whether the evidence was of any value or not; for, although at times or in a degree irrational or insane, in the opinion of the witness the important question was, what was his capacity for knowing 'the wrongfulness' of the act charged against him? As in the cases cited supra, this is the test of responsibility adopted by our Criminal Code." The mental capacity and reason to distinguish between right and wrong, and to know that the particular act being committed is wrong, is thus the recognized rule in this jurisdiction of testing criminal responsibility.

We turn to the record to determine whether there is evidence reasonably tending to show that at the time of committing the act charged against defendant he was unable to distinguish between right and wrong. No witnesses were called on behalf of the defendant and the state offered no evidence to establish sanity. It may be conceded, however, that whenever evidence of insanity of the degree prescribed by Section 13.0201, supra, is produced, irrespective of its source, the presumption of sanity disappears and the mental capacity of the accused to commit the act charged against him becomes an essential element to be proved by competent evidence beyond a reasonable doubt. Defense counsel objected to receiving in evidence admissions made

by defendant to officers immediately following his arrest on the ground that the admissions were not voluntary statements made by a competent person. The objection was overruled "subject to pertinent testimony with reference to competency" of the defendant at the time the statements were made. The medical evidence introduced at the sanity inquiry in November, 1954, was then received. Defendant as we have above stated was committed to the state hospital for the insane under the provisions of SDC 1960 Supp. 34.20 for examination as to his mental competency to stand trial. SDC 1960 Supp. 34.20A prescribes the procedure to be followed at the trial on plea of not guilty by reason of insanity. The inquiry into the sanity of an accused before trial or after conviction is entirely distinct from the proceedings on plea of not guilty by reason of insanity. In People v. Field, 108 Cal. App. 2d 496, 238 P.2d 1052, 1055, defendant under similar provisions had been adjudged insane and committed to a state hospital. The court held that "insanity which demands that a person shall be confined in a state hospital is not necessarily the same insanity which bars the prosecution of that person for the commission of a felony". People v. McConnell, 80 Cal.App. 789, 252 P. 1068, 1069, is therein cited and quoted as follows: "In criminal cases a partial insanity, or an insanity with respect to certain subjects, is not incompatible with the possession of mental capacity sufficient to make the party liable to punishment for his acts. It does not follow, therefore, because one was so committed in the manner indicated, that the commitment is proof that such person was insane to the extent that the law would exempt him from responsibility for his criminal acts. As was said in People v. Willard, supra, [150 Cal. 543, 89 P. 124] there are many kinds and degrees of insanity, and it is not every kind or degree which will relieve a person from criminal responsibility, and the degree of mental impairment which would authorize his confinement in an asylum for the insane may be entirely different from the degree of mental derangement which will relieve him from responsibility for his criminal acts. One may be insane upon one or several subjects, and

for that reason a proper person for confinement in a state asylum to be cared for and treated for his mental disorder, and yet at the same time such person may be perfectly sane upon all other subjects, and entirely responsible under the law for a criminal act committed by him." And as the court said in Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608, 617: "Mental illnesses are of many sorts and have many characteristics. They, like physical illnesses, are the subject matter of medical science. They differ widely in origin, in characteristics, and in their effects on a person's mental processes, his abilities, and his behavior. To make a reasonable inference concerning the relationship between a disease and a certain act, the trier of the facts must be informed with some particularity. This must be done by testimony. Unexplained medical labels—schizophrenia, paranoia, psychosis, neurosis, psychopathy—are not enough. Description and explanation of the origin, development and manifestations of the alleged disease are the chief functions of the expert witness."

 When we consider the probative effect of evidence in the light of the statutory test of criminal responsibility, the defense of insanity cannot be made to depend on evidence which does not tend to show that accused did not possess mental capacity sufficient to make him liable to punishment. The evidence was not sufficient to cast on the state the burden of proving defendant's sanity.

Homicide is defined by statute as the killing of one human being by another. Homicide, if not excusable or justifiable under the circumstances, is either murder or manslaughter. SDC 13.2001; State v. Painter, 70 S.D. 277, 17 N.W.2d 12. SDC 13.2007, as applicable to the instant case, provides: "Homicide is murder in the following cases: * * * (3) When perpetrated without any design to effect death by a person engaged in the commission of any felony; * * *." SDC 13.2013 provides: "Homicide is manslaughter in the first degree in the following cases: * * * (2) When perpetrated without a design to effect death

and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide; * * *." By the provisions of SDC 13.2016 manslaughter in the second degree includes all forms of criminal homicide which are neither murder nor manslaughter in the first degree. With respect to manslaughter it is the duty of the jury to find the degree of manslaughter of which defendant is guilty. SDC 1960 Supp. 34.3671.

Count two of the information charges an unintentional homicide committed by the defendant who at the time was engaged in the commission of robbery. The jury returned a verdict of manslaughter in the first degree. Intent to kill was not of the essence. A killing is murder by force of the above provisions of Section 13.2007, supra, regardless of whether it is intentional or accidental.

The evidence is sufficient to support the verdict. As we have seen the money on the person of the deceased was taken by defendant and the evidence including defendant's statements to the arresting officers shows that the killing was committed in perpetration of the crime of robbery. It was not necessary as contended that the evidence show an awareness on the part of the deceased that he was being robbed. State v. Stecker, —S.D.—, 108 N.W.2d 47. An Information alleging murder embraces all the elements of the lesser crimes of manslaughter defined by statute. A jury may find defendant guilty of any offense the commission of which is necessarily involved in that with which he is charged. SDC 1960 Supp. 34.3669. It follows that if, as we have concluded, the evidence adduced was sufficient to have sustained a verdict of murder, it was sufficient to sustain the verdict of manslaughter.

The judgment for the foregoing reasons is affirmed.

All the Judges concur.