STATE, Respondent v. ZOBEL, Appellant

(134 N.W.2d 101)

(File No. 10094. Opinion filed April 5, 1965)

**Roubideaux, Poches & Reade,** Fort Pierre, for defendant and appellant.

**Frank L. Farrar,** Atty Gen., **Robert A. Miller,** Asst. Atty. Gen., Pierre, **Herman Bleeker,** State's Atty., Hanson County, Alexandria, for plaintiff and respondent.

BIEGELMEIER, J. Defendant and his wife were charged in two counts of murder of their daughters, Rose Marie and Patty Sue in Hanson County, South Dakota. The court granted defendant's requests for a separate trial and a change of venue to Davison County. After entering a plea of not guilty, the jury returned a verdict of guilty of second degree manslaughter on each count. From a sentence of the maximum of four years confinement in the State Penitentiary—to run consecutively—and $1,000 fine on each count, defendant appeals.

It is claimed the evidence is insufficient to justify the verdict. On appeal, this court accepts that evidence, and the most favorable inferences that can be fairly drawn therefrom, which will support the verdict. State v. Geelan, 80 S.D. 135, 120 N.W.2d 533. The evidence will therefore be stated and reviewed in that light. Even a resume will necessarily be extensive. Defendant lived on his father's farm three miles south of Alexandria with his wife and five children. The couple were married in 1954 or 1955. The children's ages do not clearly appear. Mary Lou appears to be the oldest, Rose Marie was 4, Patty Sue 21 months with Michael, Jr., between them; Carmen, the baby, was born in May 1962. The sixth child, Elizabeth Ann, sometimes referred to as Liz had been placed in a foster home under facts to be presently related. A seventh child was expected to be born around the date of this trial in May 1963.

In August 1959 when there were four children, defendant's wife, Annabella, was arrested and charged in justice court in one count with a felonious assault with intent to kill Elizabeth Ann, then about two years old, and in a second count with a felonious assault with intent to do bodily harm, but without intent to kill her. The extent of injuries inflicted on Liz does not appear except she was carried into the hospital. On application of her attorney, the court appointed a psychiatrist to examine her and testify as an expert witness under SDC 36.01. On March 1960 she pled guilty to count two of the information and count one was dismissed. The trial court sentenced her to two years in the penitentiary, suspended the sentence and placed her under the supervision of the Department of Probation and Parole for four years. While the preliminary complaint was signed by the state's attorney, it appears defendant notified the authorities of his wife's felonious assault on Liz. Apparently the psychiatrist made written reports available which were discussed, but not filed, at the time sentence was pronounced. They were referred to as letters, reports and recommendations and in part introduced in evidence at this trial. Defendant read the reports and talked them over with his attorney as they affected a dependency and neglected child proceeding in county court to take custody of Liz from her parents, which defendant opposed. One of the

reports read: "* * * This woman knows the difference be-tween right and wrong * * *". A later report:

> "She has evidenced a total inability to handle her chil-dren * * *. Her hostility is very poorly controlled * * *. Much of her antagonism and hostility is dir-ected toward women. It is therefore possible that her daughter, Liz, being one, * * * takes the brunt of her hostility. Were it not for Liz, it is possible that an-other child would take the same kind of beating. * * * It is of considerable doubtfulness that her children should be left in her custody. * * * one wonders whether they should leave any of the children within the parental families. One cannot deny the rights of the paternal side. * * this recommendation might result in the chil-dren being at least available to the father."

Defendant signed his wife's bond as surety to guarantee her appearance in circuit court. He was present and heard the proceedings when his wife was sentenced. After some discus-sion the following appears:

> "The Court: It is hard for me to understand how any-body could do anything like that to a little helpless child * *. Do you think you would ever do anything like that again? A. No. Q. You realize how serious it is, don't you? A. Yes. * * *

> "The Court: * * * you continue to perform the duties of a mother in taking care of the other children prop-erly. * * * if you perform the duties of a mother * * * properly you will not have to serve these two years; but if for any reason you should attack or as-sault any of your other children within this four year period, you could be * * * required to serve the two years * * *."

Defendant testified at the 1960 county court custody hearing he was not afraid of his wife; his wife should not strike the chil-dren and if he saw her do it he would not permit it; he could stop her and felt it was his obligation as the father; there was

no indication of trouble with any of the other children; and if his wife ever did mistreat Liz he would be willing to come in and tell the judge about it, even if it wasn't too severe or would cause problems; before it would be dangerous for Liz he would tell the sheriff and see she was taken care of and protected. He said the purpose of his county court testimony was if Liz came back he would take good care of her and the other children.

While on probation in 1961 Mrs. Zobel was sent to the State Hospital for the Insane because she had assaulted one of her children, probably Rose Marie. In January 1962 Patty Sue and Rose Marie were left briefly in the home and care of defendant's sister-in-law. She took colored photos of Patty Sue which show her to be of normal weight and size for a one-year-old child. She testified Patty looked very well and was fat, yet in June when left in her care she noticed Patty was thin.

With this background we turn to November 9, 1962. Defendant was picking corn at three o'clock that afternoon with two of his brothers on their farm two miles from his home when they saw his wife walking or running down the road carrying a child. At his brother's suggestion he got into his car, picked them up and went home. His wife told him Patty Sue had choked to death on hamburger she was feeding her for afternoon lunch. He went back to his brothers, told them to notify the law; they all went to defendant's home and saw Patty Sue lying on a davenport, dead. While the brothers went to town defendant sat in a chair in the living room holding Carmen the 6-month-old baby and Michael, Jr. He did not see Rose Marie around and made no inquiry about her or even talk to his wife. The sheriff arrived in half an hour and, after asking where Rose Marie was, they all went upstairs and found her in dire straits:—starved, weakened and badly beaten. The floor of one room to another was covered with blood, as was the bed, crib and mattress. The mother said "Rose Marie, get up—you have company" to which the sheriff said "Annabelle, she can hardly breathe; and how come you haven't taken her to a doctor or to a hospital?" Her answer was she asked Mike several times and he was too busy picking corn. The state's attorney had also arrived and told defendant

to carry her downstairs. There he said to them: "Mike and Anna-belle, how could you let this happen?" Mrs. Zobel answered—"Well, I've been having trouble with the children, and I asked Mike to take me to the doctor and he wouldn't do it." Mike was present, heard these two conversations and said nothing.

Pictures of these two children taken as they lay on the daven-port were admitted in evidence. The state's attorney directed de-fendant's brother to drive Rose Marie to a hospital nearby and defendant to go along. Defendant told the doctor she had fallen a few days earlier and later advised a parole agent that both children had fallen downstairs. The doctor's examination showed she was in a semi-comatose condition, extremely list-less, pale with rapid breathing and did not move except to turn her eyes from one side to another. She was removed to another hospital where brain surgery was performed, but died Novem-ber 21, 1962.

Patty Sue's condition from a post-mortem examination showed she was emaciated and weighed 12½ pounds; normal weight was 32 pounds. The skin showed loss of fluid and considerable wrinkling. Many marks of violence were present. On the scalp were two rounded abrasions covered with crusted blood. On the face were multiple and different sized abrasions and con-tusions. There were four rounded to straight line abrasions; nine straight line abrasions, some partially crusted with blood; these were predominate on the cheeks and lips. The chin had a straight lined laceration, a cut breaking completely through the skin, showing crusted blood. The ears had similar abrasions. The shoulder, back and buttocks, thighs, all had abrasions with one large one; some were covered with scabs. The scabs were from one to four days old. Both lower legs showed edema. The right fourth rib in the back had been fractured and the rib pro-truded into the pleura cavity with some blood in it. The ninth and tenth ribs had nodular projections which appeared to be healed fractures at least six weeks old. The cranial cavity con-tained crusted blood profusely over the entire surface and base of the brain. Nothing appeared that would have prevented the child from taking food normally. The cause of death was the

hemorrhage into the cranial cavity caused by a blow to the head by a blunt instrument such as the metal tube and stick with blood stains found later in the upstairs room.

Rose Marie's condition was described as follows: She had abrasions and lacerations on each side of the forehead from ten to fourteen days old with dry crusts over these areas; a bruise on her cheek and right jaw, an abrasion and dried crust across three-fourths of her upper lip, these over a week old; a recent blood clot under the lip; a bruise about the right elbow and forearm of two or three weeks' duration, a bruise on the second and fourth digits of the right hand; the upper left arm was swollen and discolored. The left arm above the elbow was broken; it had not united or healed and there was bony growth on the ends of the fractured bone where it had attempted to heal and grow together. There was a large bruise across the left buttock extending around the thigh, of at least two weeks' duration and a bony prominence of the right sacroiliac joint. Reflexes were subnormal and she responded very poorly in eliciting tenderness; there was marked wasting and emaciation of extremities and trunk; the stomach was distended. An X-ray showed rib fractures of the 6th, 10th, 11th and 12th ribs on the left side, and rib fractures on the 7th, 8th, 9th and 11th ribs, with two on the 10th rib making ten in all. It also showed the unstable fracture of the upper left arm which had existed from four to six weeks and had not united or healed. It revealed a fracture of the pelvis, an old injury in the right sacroiliac joint and an old fracture of the left wrist. It also showed the former fracture of the left upper portion of the left upper arm, (not the unhealed one above mentioned) which the same doctor had treated in the fall of 1960, was healed. The doctor concluded the child had been mistreated and advised defendant the authorities would have to be notified.[1]

Rose Marie was moved to a Sioux Falls hospital where she died. A pathologist performed an autopsy and testified she weighed 15 pounds and was extremely emaciated; her normal

1. Ch. 90, Laws of 1964, now requires such notice to be given the county judge of the child's residence and provides a penalty for failure to do so.

weight should have been 35 pounds. There were atrophic scars about the body too numerous to mention, the majority confined to the back and head. There were numerous abscesses and pus pockets through the brain system and an extensive blood clot over the brain, with infection of the lining membranes and brain abscesses secondary to the blood clot. A blunt force, such as above mentioned metal tube and stick could inflict, caused the blood clot, infection and death. Normally the skin on the head can be easily resected from the bone, here they were so rigid they had to be cut away. In her emaciated condition there was greater likelihood of infection arising because of the lower resistance of the person and this condition had something to do with the infection. A defense witness said she noticed some bruises which if on her children she would have taken them to a doctor and others to the hospital. The situation became so bad even the neighboring Zobels quit coming and Mrs. Zobel's mother said they had not visited them during the last year. There was evidence in defendant's presence Mrs. Zobel refused to give food Rose Marie asked for at meal time and grabbed food given to them and threw it in the dirt, saying she was the only one who could feed them. These outsiders noticed Patty and Rose Marie were becoming thin; saw Mrs. Zobel slap one child so hard she fell to the ground; once she picked a child out of the crib when she smiled at defendant's brother, shook her in a "cruel, cruel" way just to make her cry. Defendant was present and made no effort to restrain her. On another occasion she threw Rose Marie three or four feet into her crib so she nearly bounced back out. Again Rose Marie was spanked so hard by Mrs. Zobel that her sister, who had been in the home many times, jumped up and hollered for her to stop. Defendant never said a word, just "sat there and grinned". The sister asked him later why he didn't stop her; he said he tried. She testified "When I was there, he didn't try, ever."

It appears the state does not claim defendant actually struck the blows that caused the deaths; that while his wife actually did, he had knowledge of her propensities and past injuries to Liz, and her mental attitude toward these children; he knew they were being cruelly punished and brutally beaten, deprived

of necessary food and medical attention and exposed to these dangers over a period of many months; that all the while he concealed his wife's starving and beating of the children and their condition; his failure to act was wilful neglect of his duty to support and protect them, a misdemeanor and death resulting therefrom became punishable as a felony.

That a father owes a duty to support infants of tender years would seem to be axiomatic; it is a principle of natural law and of the common law recognized by many courts. The status and development of this duty is of interest. Our present statutes read:

> SDC 14.0303: "The father and mother of a legitimate unmarried minor child are equally entitled to its custody," SDC 14.0310: "The parent entitled to the custody of a child must give it support * * *"

Parents are bound to maintain and protect their children during their infancy, Stanton v. Willson's Executors, 3 Day (Conn.) 37, 3 Am.Dec. 255; this duty is a principle of natural law and may even justify an assault and battery in their defense, People ex rel. O'Connell v. Turner, 55 Ill. 280, 8 Am.Rep. 645. South Dakota by SDC 13.2003(2) justifies a homicide by a parent in lawful defense of his child. At common law the principal duties of parents to their children consisted of their maintenance, protection and education, imposed by principles of natural law and affection laid on them by nature herself by their bringing them into the world, School Board Dist. No. 18, Garvin County v. Thompson, 24 Okl. 1, 103 P. 578, 24 L.R.A.,N.S., 221. There the court said statutes similar to ours defining the relations between parent and child were in the main declaratory of the common law. Our court in Haakon County v. Staley, 60 S.D. 87, 243 N.W. 671 was of the same view, saying the duty of a husband to support his minor children existed at common law, which duty was declared by our statutes. See also West v. West, 114 Okl. 279, 246 P. 599; Gallagher v. Johnson, 237 Mass. 455, 130 N.E. 174, 15 A.L.R. 411. These decisions but echo a law writer of earliest times: Cooley's Blackstone's Commentaries, Book I, Chapter XVI, page 447.

Exposing an infant to the elements so it dies has been held a felony. In Gibson v. Commonwealth, 106 Ky. 360, 50 S.W. 532, 90 Am.St.Rep. 230, defendant left her two-month-old child on a doorstep one night covered only with a shawl. The next morning it was found dead from starvation and exposure. A verdict of manslaughter was affirmed. The court wrote: "The law imposed upon defendant the duty of protecting and caring for her offspring to the best of her ability; and when she willfully abandoned it on a cold, raw night, and left it to die from exposure, she was guilty of a felony, whatever may have been her purpose in leaving it".

Territory v. Manton, 7 Mont. 162, 14 P. 637, was an appeal from a husband's conviction for murder in the second degree for negligently allowing his wife to be out on the ice, poorly clad, during a cold winter night, her death resulting from the cold and exposure. The indictment was vigorously attacked. Chief Justice McConnell, speaking for the court, said:

"The proximate means of her death were the cold and inclemency of the weather. These were allowed to do their work of destruction by the criminal negligence of the defendant to do the duty of protection, which he owed her as husband. The point is made by the counsel of defendant, that this indictment charges no crime known to the law; that a husband, having the ability to protect his wife, may stand passively by, and see her sick and weak and helpless, refuse to help her, and allow her to perish under the influence of the cold and inclemency of the weather; and this negligence was the result of malice, this refusal to help the product of a felonious, willful, premeditated purpose. There is no charge of an assault made; none that he exposed her to the inclemency of the weather; but he finds her exposed to the unpropitious elements, and he criminally leaves her there to die. If the defendant had, by his own acts, subjected her to the inclemency of the weather, there would be no doubt but that he would be guilty of murder if she had died from the exposure, and he had so subjected her unlawfully

and with malice aforethought. But the question is, when he absolutely does nothing, when the very **gravamen** of the charge is his failure to do something, can he be guilty of murder or manslaughter either? She perishes of cold. It is the agent which causes death. He might have prevented it, but he wickedly refused, and lets her die. This is the question we have to consider. * * * the very volition of the defendant by which he was led to refuse aid to his wife when the law imposed the duty upon him to protect her, is transferred to the violence of the elements, and he is made to use their forces, and is responsible for the death which they immediately caused."

There was a reversal for error in the instructions. On retrial, a manslaughter conviction was affirmed. Territory v. Manton, 8 Mont. 95, 19 P. 387.

Two recent opinions of similar import are worthy of mention. Many of the physical beatings here resemble those related in Mobley v. State, 227 Ind. 335, 85 N.E.2d 489. They were in the main inflicted by one Fagan, who was living with defendant. Ella Mobley, on her three-year-old child. They continued over a period of about five weeks when the child died. After describing Fagan's actions in beating and torturing the child the court said:

"These were not isolated occurrences, but happened repeatedly and came to be a part of a more or less established course of conduct, to which Mrs. Mobley, by her presence, and failure to stop it, became a party. * * *

"Even if the jury had not believed that violence by the mother caused or helped to cause the child's death, it reasonably could have found that she aided and abetted Fagan in causing it. * * * the trier of the facts may consider failure of such person to oppose the commission of the crime in connection with other circumstances and conclude therefrom that he assented to the commission of the crime, lent his countenance and approval thereto and thereby aided and abetted it.

\* \* \* This, it seems to us, is particularly true when the person who fails to interfere owes a duty to protect as a parent owes to a child."

In Palmer v. State, 223 Md. 341, 164 A.2d 467, the theory of the state's case was defendant mother was guilty of criminal negligence in permitting McCue, her paramour, to inflict prolonged and brutal beatings on her twenty-month-old child. The beatings continued over a period of three weeks and resulted in the child's death. The Maryland statute charged a mother of minor children with their "support, care, nurture, welfare and education". The court wrote:

"We think that the appellant's conduct and actions, in permitting and, in fact, compelling this poor little defenseless urchin to remain in an environment where she was subjected to merciless, inhumane and inordinate brutality of a protracted nature, manifested a recklessness of justice and the rights and feelings of the tiny infant in such a manner so as to support the finding that the appellant's conduct and actions displayed 'a wanton or reckless disregard for human life.' The actions of McCue were so outrageous as to put any reasonable person on guard that the child's life was in real and imminent peril. Manifestly, the appellant should, and could, have removed little Terry from the cruelty and danger. Instead of doing so, she, quite to the contrary, affirmatively importuned Mrs. Coperhaver to prevent any such removal. Such conduct, when coupled with the remaining facts of the case, clearly supports the conclusion by the trial judge of gross and criminal negligence on the part of the appellant. \* \* \*

"There seems to be no doubt that the direct and immediate cause of Terry's death was the violent blow or blows inflicted upon her by McCue on September 3rd. \* \* \*

"We pointed out above that McCue's violent and unrestrained actions were of such a nature as to put any ordinary, reasonable person on notice that the child's

life was truly and realistically in immediate peril. The appellant easily could, and should, have removed Terry from this danger. Her failure to do so, under the circumstances previously described, is sufficient, as indicated before, to support a finding by the trial judge that her gross and criminal negligence was a contributing cause of Terry's unfortunate death."

There was ample evidence that from before his wife's conviction in 1959 through 1962, visitors, friends and relatives saw and noticed the marks, scabs and bruises on the children. These became progressively worse in 1962 when the children were described, even by defense witnesses, as "always" having marks on them. The record is replete with incidents of failure to permit the children to eat food, taking it away from them and throwing it on the ground and vicious beatings given the children by the mother, in defendant's presence.

From the summary of the evidence set out herein, the jury could find the acts of defendant and his wife for some time before November 9, 1962 were part of a course of conduct in which both joined. It consisted of cruel and inhuman beatings by his wife, to which he exposed his children by permitting them over a period of time without objection and his failure to see they received necessary food and medical care. This caused their emaciated condition and contributed to Rose Marie's death, the result being a greater likelihood of infections and a lower ability to fight them off. Finally defendant neglected to procure necessary medical aid even though the evidence was his wife had asked him to do so. Defendant not only knew of his wife's propensities, he saw them in action and by his nonaction and representations to others that the children were fine, became a party to them. Abrasions, lacerations and bruises on Rose Marie's head were one to two weeks old; they, with the infections and pus in the blood clots on the brain indicate the length of time since she had received the fatal blows and was in need of medical care. Crusted blood, four-day-old scabs and six-week-old bone fractures and edema in Patty Sue's body showed old beatings. The jury chose to believe testimony he knew the condition of the

children for some time before their deaths; knew they were in need of food and medical care rather than defendant's testimony that, living in the same house, he did not see the children from Wednesday morning until Friday afternoon. At that time Patty Sue was dead and Rose Marie was hardly breathing—the doctor's testimony and picture in evidence indicate Rose Marie was practically unconscious. The jury could find defendant deprived the children of these necessities and utterly neglected to do anything for them. This is no punishment for acts of his wife's; it is a violation of his duty to the children. Wilful neglect and depriving a child of necessary food or medical care do not necessarily envisage doing an act; they are negative things— failures to act. As aptly stated in Commonwealth v. Stewart, 12 Pa.C.C.R. 151, 2 Pa.Dist.R. 43 (note 36 A.L.R. 869): "Neglect is negative in character. When a positive act is done it generally carries with it evidence of the intent with which it was done. As to a matter negative in character, a person who knows his duty, is able to do it, and does not, must be held to have wilfully neglected it."

If such acts are wrongful conduct and punishable violations of law, as they are under our statutes, can there be any reason or logic for a father, under the facts stated in the Gibson v. Commonwealth opinion, supra, who saw the child placed on the step, walked away and left it there and then be allowed to say it was not his act—no violation of his duty to take such action as a reasonable person should know was necessary to protect the child? The answer must be—No; each spouse has an equal duty to support and protect the child and cannot stand passively by and refuse to help them when it is reasonably within their power to do so. This is the sense in which the court must say wilful neglect of a parent includes the failure to maintain and protect an infant. Defendant had taken some action as to his daughter Liz before his wife's ill treatment had resulted in her death. It is this duty to maintain and protect that follows the custody granted in SDC 14.0303 upon which the first sentence of Instruction 11 hereafter set out was based. For a father to unnecessarily expose, cruelly punish or wilfully neglect the child or deprive it of necessary food or medical care is declared to be unlawful, SDC 13.3301 hereafter quoted, and a mis-

demeanor, SDC 13.3303 and SDC 13.0103; where death ensues caused thereby it comes within the terms of manslaughter in the first degree. SDC 13.2013.

 ■ The degree of neglect, exposure and deprivation of necessary food or medical care that make a man criminally responsible is difficult of further definition than the statute itself, as is the line between failure of duty which make one criminally liable and that which does not. The question must be left to a great extent in each case to the common sense of a jury. Stehr v. State, 92 Neb. 775, 139 N.W. 676, 45 L.R.A.,N.S., 559, Ann.Cas. 1914A 573. There defendant was convicted of manslaughter by negligently causing the death of his four-year-old stepson by failure to heat the room where he slept with insufficient bedding. Frozen feet, gangrene and death resulted. It was said it was the duty of an immigrant, six months in this country, to see the child's life was not endangered; even if he did not have the means to pay for the child's care, his duty was to apply to the public authorities for relief. The same duty of support was stated in Commonwealth v. Hall, 322 Mass. 523, 78 N.E.2d 644, when the mother left a child to die in an attic and stated she had no means to support it. The evidence was sufficient to submit the question to the jury whether defendant was criminally responsible for the deaths of his two infants under appropriate instructions.

 Defendant complains of two of the court's instructions. The trial court instructed the jury homicide is manslaughter in the first degree when perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor involving moral turpitude, SDC 13.2013(1); that the phrase ending with moral turpitude meant a misdemeanor contrary to justice, honesty and good morals. No objection was made to this instruction. As to first degree manslaughter it is based on SDC 13.2013, with the definition of moral turpitude written by this court in In re Kirby, 10 S.D. 322, 328, 73 N.W. 83, 94, 39 L.R.A. 856.

 ■ By Instruction No. 8, the court stated:

 "You are further instructed that whenever the grade of punishment of homicide is made to depend upon its

having been committed under circumstances evincing a depraved mind or unusual cruelty, or in a cruel manner, the jury may take into consideration the fact that any domestic or confidential relation existed between the accused and the person killed in determining the moral quality of the facts proved."

Objection was made the instruction says in effect "the mere fact that they are husband and wife makes for a higher degree of responsibility as between husband and wife than there would be between ordinary persons." The instruction does not sustain that construction. It does not mention or refer to any relationship except that of the "accused (defendant father) and the person killed (child) and was not erroneous in that respect. It correctly states SDC 13.2005.

Instruction No. 11 was as follows:

"The court instructs the jury that the statutes of this state provide that the father and mother of a legitimate, unmarried, minor child are equally entitled to its custody. The statutes of this state further provide that it is unlawful for any person to unnecessarily expose, cruelly punish, or wilfully neglect such child, or deprive such child of the necessary food or medical care; and any person violating this statute as to abuse of children is guilty of a misdemeanor involving moral turpitude."

This is based on SDC 13.3301, which provides in part:

"It shall be unlawful for any person to * * * wilfully, negligently, or unnecessarily expose, torture, torment, cruelly punish or willfully neglect such child (under the age of fourteen years) or deprive such child of necessary food, shelter, or medical attention."

The objection was the addition of the clause that any person violating that statute was necessarily committing an act of moral turpitude. Guided by the Kirby definition, if violation of this statute is not contrary to justice (both natural and statutory) and good morals, we are at a loss to know of what they consist. See In re Kirby, supra. These instructions were not erron-

eous. SDC 13.0103 defines a crime as an act or omission forbidden by law and to which is annexed a punishment by imprisonment or fine; that crimes are either felonies or misdemeanors. SDC 13.3303 provides the punishment for violation of SDC 13.3301 as a fine or jail sentence or both, making it a misdemeanor.

■ The other instructions were not excepted to and, with the instructions above discussed, became the law of the case. The court further instructed the jury that all persons concerned in the commission of a crime, or aid or abet in its commission are principals; aid and abet were stated to comprehend all assistance rendered by acts or words of encouragement or presence. The last instruction was apparently based on the provisions of SDC 13.0203 which provides in part: "All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense or aid and abet in its commission, though not present, are principals. * * *"

■■ Defendant argues the evidence here shows he had sufficient food on hand to feed his family and this fulfilled his duty. A Pennsylvania statute made it an offense to wilfully neglect a child. Defendant father was charged with its violation. The court wrote:

> "It would be no answer to a charge of neglect to show sufficient food had been provided for a child too young to feed itself or clothing for one unable to put it on. The duty of protection is not limited to preventing attacks by others. It requires that parents shall protect their children from the consequences of their own weaknesses and ignorance. It was therefore the duty of the defendant to see that his children had sufficient food, properly administered * * *". Commonwealth v. Stewart, 12 Pa.C.C.R. 151, 2 Pa.Dist.R. 43 (note 36 A.L.R. 869).

As the evidence showed defendant's wife was under the jurisdiction of the division of Probation and Parole, he also contends —as we view it—that it was the duty of the parole agents to check the children and this relieved him of some or all responsibility

for their care or control over her actions. The evidence being in dispute, it was for the jury to determine those questions of fact. However, we have not arrived at the place where this kind of state interposition relieves a father of his duties to his family when his wife is sentenced and on parole. Defendant's duties to his children were not affected or diminished thereby. A child is not deprived of its right to protection and support by its father, because of any family quarrel or agreement, Dyer v. State, 58 Okl.Crim. 317, 52 P.2d 1080, nor by parole of the mother under sentence by a court. Before passing this point, we cannot refrain from mentioning the visits of the parole agents were more or less perfunctory; that more careful investigations, observations and inquiries as to the very acts for which defendant's wife was under probation may have been of real help in this sad state of affairs.

 ██ Defendant asserts the trial court erred in admitting in evidence black and white pictures of Patty Sue and Rose Marie Zobel taken as they lay on a davenport in the Zobel home when the officers arrived, an X-ray of Rose Marie and colored slides of the two children. The slides were projected on a screen before the jury. Admission and rejection in evidence of photographs is largely within the discretion of the trial court. Whaley v. Vidal, 27 S.D. 642, 132 N.W. 248. The black and white pictures showed the children's condition much better than oral descriptions could describe. They showed bruises and scabs many days old and emaciation which the state could contend were such no reasonable person could ignore without being wilfully neglectful of their care. A doctor used the X-ray in a viewer to describe the many bone fractures. This is so commonly done we can perceive no error from admitting this evidence.

Three of the exhibits were colored slides of Patty Sue taken by the doctor who performed the post mortem. The doctor stated the pictures made the actual condition more graphic. Two showed emaciation of the body and multiple bruises and lacerations, the laceration of the chin and cheeks being more evident than on the black and white picture. The third showed the mass of blood on the surface of the brain and all reflected the severity of the injuries.

Two colored slides of Rose Marie were taken when she was admitted to a Sioux Falls hospital November 22nd and two after her death. The first two showed numerous scars and scar tissue and her general condition. The others showed the extensive blood clot, associated infection and the amount of pus that rested over almost the full top of the brain. This doctor testified the slides better illustrated the extent of the blood clot and the scars on her body. Admissibility of these slides was, as with the photographs, within the discretion of the trial judge. There was no indication they were distorted or did not portray an accurate representation of the deceased children. Photographs, slides and X-rays are admissible when they accurately portray anything which it is competent for a witness to describe in his own words, or where they are helpful as an aid to a verbal description of objects or conditions and relevant to some material issue. They are not rendered inadmissible merely because they vividly bring to jurors details of a crime or incidentally tend to arouse passion and prejudice. They are a common and recognized medium in this day for depicting events. State v. De Zeler, 230 Minn. 39, 41 N.W.2d 313, 15 A.L.R.2d 1137; see State v. Huff, 14 N.J. 240, 102 A.2d 8 and 40 N.D.L.Rev. 192.

██ ██ It appears the trial court permitted the jury to take a viewer into the jury room to view the colored slides over defendant's objection. This is a discretion trial courts should exercise with caution. However, the jury saw the slides projected on a screen in the courtroom as exhibits so it was not error to allow the jury to use the viewer. For our review, we have likewise used one here.

██ Whether the verdict of second degree manslaughter can be sustained on a charge of murder and the evidence deserves attention. Homicide, murder and manslaughter in the first and second degrees are defined in SDC 13.20. Manslaughter in the second degree was held to be an offense included in both the charge of murder, State v. Hubbard, 20 S.D. 148, 104 N.W. 1120, and manslaughter in the first degree, State v. Painter, 70 S.D. 277, 17 N.W.2d 12. See also State v. Stumbaugh, 28 S.D.

50, 132 N.W. 666; State v. Godlasky, 47 S.D. 36, 195 N.W. 832 and State v. Violett, 79 S.D. 292, 111 N.W.2d 598, 608.

By SDC 34.3671 whenever a crime is distinguished into degrees, the jurors must find the degree of the crime of which defendant is guilty and by SDC 34.3669 may find him guilty of any offense, the commission of which is necessarily included in that with which he is charged. In the Stumbaugh opinion Judge Corson, after reviewing many decisions stated these provisions of the code "have been in force in the territory and state since 1865, and under these provisions many convictions have been had in this state of manslaughter in the first and second degrees, under indictments charging the offense of murder; and the propriety of instructions by the trial courts, calling the attention to the lessor offenses of manslaughter in the first and second degrees, has not, to our knowledge, been before questioned." Both State v. Hubbard and State v. Painter declare it the duty of the court to instruct as to included offenses and failure to do so to be erroneous. It would be an anomaly to require these instructions to be given and when the jury returned a verdict in compliance therewith, to set it aside.

Other courts are in accord with our decisions. The Oregon Supreme Court under a statute similar to SDC 34.3669 upheld a conviction for manslaughter on a charge of murder in the first degree. State v. Nortin, 170 Or. 296, 133 P.2d 252. The court quoted from Section 653, Wharton on Homicide, (3rd Ed.) as follows: "a verdict for a lower degree of homicide will not be set aside on the ground that the evidence does not make out that degree of the crime in terms as defined by the statute, when it would have supported a finding of a higher degree." State v. Williams, 197 Iowa 813, 197 N.W. 991. The same thought is expressed in State v. Hubbard, supra, where the court quoted from another opinion as follows:

" 'In such cases the jury are the sole judges of the state of facts disclosed on the trial, which may justify them to return a verdict of manslaughter, and the court is powerless to avoid their verdict, because in its opinion the

evidence called for the finding of a higher offense. The verdict under the law would be responsive to the indictment, and it should stand, although it might be illogical, unjust, or unjustifiable under the evidence. Examples are not wanting of cases in which the jury have condemned some of the conspirators in a murder case for the highest offense charged, and the other conspirators for manslaughter only.' "

It is, therefore, unnecessary to consider the effect of, or measure the conduct of defendant by, the standards in SDC 13.2016. Cases like State v. Bates, 65 S.D. 105, 271 N.W. 765, are not here in point, as they involve charges and convictions brought for deaths resulting from and based on culpable negligence mentioned in SDC 13.2016. Attention is called to the interesting discussion of our first and second degree manslaughter statutes which appears in State v. Denevan, 49 S.D. 192, 206 N.W. 927.

 Other assignments of error involving admission of a bloodstained metal tube and stick found in a bedroom, remarks of the court and counsel during the trial have been considered and reveal no prejudicial error. The record here not only shows a "deplorable and distressing set of circumstances" mentioned in Palmer v. State, supra, it presents a "shocking picture of cruelty"[2] and paternal unconcern as described in Mobley v. State, supra. Defendant had a fair trial and his conviction is affirmed.

RENTTO and HANSON, JJ., concur.

ROBERTS, P. J., and HOMEYER, J., dissent.

HOMEYER, Judge (dissenting).

I respectfully dissent. Defendant was charged with a single count—murder. I do not understand the position of the majority to be that the evidence would sustain a conviction of murder. They reason that it would support a finding of wilful neglect

---

2. "You may think that such incidents could not possibly take place in your community", is said in an article in the September, 1964 Reader's Digest under the title "The Shocking Price of Parental Anger". See also Jan. 3, 1965 issue of Time magazine, page 43. The prevalence of this cruelty evidently caused the passage of Ch. 90, Laws of 1964, note 1.

under SDC 13.3301, a misdemeanor, and since the children died the evidence is sufficient to sustain a conviction of first degree manslaughter under SDC 13.2013 which in part reads: "Homicide is manslaughter in the first degree in the following cases: (1) When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor involving moral turpitude; * * *" They further reason that second degree manslaughter of which defendant was convicted is a necessarily included offense of first degree manslaughter, and thus the conviction must be sustained.

The offense of murder includes all the elements of the lesser included crimes of manslaughter and evidence necessary to establish the greater crime will support a conviction of a lesser crime of manslaughter. State v. Violett, 79 S.D. 292, 111 N.W.2d 598. Manslaughter in the first degree does not include all the elements of manslaughter in the second degree. Manslaughter in the first degree includes a homicide without design to effect death where it has been committed by a person engaged in the commission of a misdemeanor involving moral turpitude. SDC 13.2013. Manslaughter in the second degree is the killing of a human being by "the act, procurement, or culpable negligence" of another. SDC 13.2016. The lesser offense is not "necessarily included" within manslaughter in the first degree. SDC 1960 Supp. 34.3669. The jury might have reasonably found from the evidence that defendant was guilty of manslaughter in the first degree, but it does not follow that the evidence justifies a verdict of the lesser offense of manslaughter in the second degree.

The jury is required to fix the precise offense. SDC 1960 Supp. 34.3671. The defendant thereafter cannot be prosecuted or punished for a higher or lesser offense. He stands acquitted as to such offenses. The jury acquitted defendant of manslaughter in the first degree. He was found guilty of manslaughter in the second degree. The jury acting within its province might reasonably have concluded that defendant was not guilty of the violation of the provisions of SDC 13.3301 or that the deaths were not the natural and probable consequence of

the commission of such misdemeanor. The brutal acts of the insane mother may have been in the minds of the jurors the proximate cause of the deaths.

This court is committed to the rule set forth in State v. Bates, 65 S.D. 105, 271 N.W. 765, in second degree manslaughter cases. It should not be ignored. Negligence to be sufficient to support a criminal action must be something more than mere inadvertence. "There must be some action from which the jury might, reasonably infer the mens rea". In order to give rise to this mens rea, the jury must find as a fact that the defendant intentionally did something which he should not have done or intentionally failed to do something which he should have done under such circumstances that it can be said that he consciously realized that his conduct would in all probability (as distinguished from possibly) produce the precise result which it did produce. Defendant's parental inattention is not condoned. Nevertheless, resolving all conflicts in the evidence, and reasonable inferences therefrom, in support of his guilt, I am satisfied that it does not meet the criminality test promulgated by this court in the Bates case.

I would reverse.

ROBERTS, P. J., concurs in dissent.