STATE OF NEBRASKA, APPELLEE, V. BRIAN KEITH PERKINS,
APPELLANT.

364 N.W.2d 20

Filed March 8, 1985.   No. 84-308.

Rodney J. Rehm of Rehm & Bartling, for appellant.

Paul L. Douglas, Attorney General, and J. Kirk Brown, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

The defendant, Brian Keith Perkins, was convicted of first degree murder as the result of his participation in the December 2, 1982, robbery-murder of Gordon Robert Eno, and was sentenced to life imprisonment. He has appealed and has assigned as error the trial court's (1) failure to suppress his statements made during interrogation; (2) overruling of his motion to quash the jury panel for its underrepresentation of individuals 19 to 34 years old; (3) failure to declare the felony murder law unconstitutional; and (4) giving or refusing to give certain jury instructions.

The record shows that the defendant lived with Benita Bradford at a house rented from the victim Eno at 2268 S Street in Lincoln, Nebraska. On December 2, 1982, the rent was several months in arrears, and Benita had been served with an eviction notice. Benita decided that she would pay the rent due and telephoned Eno at around 5 p.m. on December 2 and told him to come by the house that evening and pick up the rent.

When Benita told the defendant that she intended to pay the rent, he decided to rob Eno of the rent money. The defendant asked Benita for a scarf and a knife. As Eno approached the front door, the defendant left the house through the back door.

While the rent was being paid, the defendant hid in the bushes along the side of the house.

While Eno was still at the residence, Walter Bradford arrived. He had been drinking, and wanted to talk to Eno about the possibility of Eno's getting him a job. An argument developed between Eno and Walter as they stood on the front porch of the house, whereupon Eno walked away.

As Eno was walking to his car, Walter jumped Eno from behind. Eno pushed Walter to the ground, at which time the defendant joined in and attacked Eno. Eno was knocked to the ground and a struggle between the three followed. The defendant grabbed Eno and told him this was a robbery. The defendant held Eno while Walter kicked him in the face several times and then searched his pockets. Eno gave up his wallet, but the defendant and Walter wanted his briefcase, hoping to find the rent money. The defendant claimed Walter stabbed Eno

while the defendant was searching for the briefcase. However, an eyewitness testified that Eno was first assaulted with a knife by a man wearing a red scarf. The defendant admitted that he was the one wearing a scarf over his face that night, a fact corroborated by Benita.

After Eno was stabbed the defendant claimed Walter forced him to help put Eno into Eno's car under threat of personal harm if the defendant did not cooperate. However, from the time of the supposed threat until the time Eno was fatally stabbed, the defendant had several opportunities to escape but chose not to.

The defendant and Walter Bradford put Eno into Eno's car and drove to a rural area northwest of Lincoln. Walter pulled Eno out of the car and, with the defendant's help, dragged him into a ditch, where Walter proceeded to stab Eno while the defendant watched. They left Eno in the ditch and returned to Lincoln in Eno's car. Both had blood on their clothes. Later that evening, the defendant threw liquid bleach on the bushes and yard area at the S Street residence, and later drove to Eno's parked car and doused both the interior and exterior with bleach. The knife used in the assault was left in the kitchen sink at Benita's mother's home.

The defendant was arrested on December 5, 1982, and interrogated by the Lincoln police. He gave a statement to the police at that time about his involvement in the crime, which was later played at trial. The defendant claims his motion to suppress his statement to the police should have been sustained because his actions in remaining silent during interrogation were a revocation of his waiver of his *Miranda* rights. He also claims the statement was not admissible because it was elicited by coercion.

After he had been arrested on December 5, 1982, the defendant was asked if he knew why he was arrested. When he answered "yes," the interrogating officer, James Peschong, told the defendant that he had a warrant for his arrest on some misdemeanor bicycle offenses and that he wanted to talk with him about the death of Robert Eno. The defendant responded twice, "Who is Mr. Eno?"

The *Miranda* rights were read to the defendant at 7:42 a.m. As each warning was read, the defendant waived that right. Officer Peschong then started questioning him. Shortly thereafter, the defendant slid his chair against a wall, stuck his feet out, slouched, rested his head against the wall, closed his eyes, and crossed his arms. He remained that way for about one-half hour while the officer continued to pose questions. At 8:15 a.m. the officer left the room. He returned around 8:40 a.m. and continued the interrogation by playing Benita Bradford's taped statement that had been given earlier that morning. For about 30 minutes, while the tape played, the defendant sat up, leaned forward, and held his head between his hands with his elbows on his knees. When the tape ended at around 9:10, Officer Peschong started the questioning again. At 9:25 the defendant said that he wanted to talk to Officer Sorensen.

At 9:30 a.m. Sorensen came into the room. The defendant told Sorensen that he had not killed Eno, and asked if he could talk to Benita. She was allowed in the room for 5 minutes. The defendant then said that he wanted to talk with Sorensen alone. The defendant started talking and asked if the statement could be recorded. Before taping the statement, Sorensen repeated the defendant's *Miranda* rights. The defendant again waived all of his rights and made a statement as to his involvement in the crime. The taping began at 9:42 a.m. and ended at 10:22 a.m.

The defendant claims that his silence from 7:45 a.m. until 9:25 a.m. was a revocation of his prior waiver of his *Miranda* rights. This contention is without merit.

The general rule governing revocation of a waiver of *Miranda* rights is set out in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the

right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id*. at 473-74. This court adopted that holding in *In re Interest of Durand, State v. Durand*, 206 Neb. 415, 293 N.W.2d 383 (1980).

In *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), the U.S. Supreme Court noted that "[t]he critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' " This right must be scrupulously honored.

Here, there was no indication that the defendant wished to end the questioning. He did not say "I don't want to talk to you," and never flatly refused to answer any questions.

*Miranda* should not be read so strictly as to require the police to accept as conclusive any statement or act, no matter how ambiguous, as a sign that the suspect desires to cut off questioning. *Lamb v. Commonwealth*, 217 Va. 307, 227 S.E.2d 737 (1976); *People v. Roark*, 643 P.2d 756 (Colo. 1982) (Erickson, J., concurring in part and dissenting in part). See, also, *Vail v. State*, 599 P.2d 1371 (Alaska 1979); *State v. House*, 54 Ohio St. 2d 297, 376 N.E.2d 588 (1978).

An expert who testified for the defense admitted that there were a "myriad of possibilities" as to why the defendant remained silent and that his actions were open to multiple interpretations. The defendant possessed at least normal communication skills and could have said that he did not want to talk to the officer. Instead of refusing to answer questions, he asked to talk with Officer Sorensen.

Under the totality of the circumstances test, there is no reason to believe the defendant revoked his prior waiver or that the statement was not voluntarily made.

*Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), established that in considering whether rights have been voluntarily waived, the court must look to the background, experience, and conduct of the accused.

The defendant here had been arrested several times previously and had been through the *Miranda* procedures prior

to his questioning in this case. On one prior occasion he refused to waive his *Miranda* rights and told the police he did not want to talk to them. At another time he agreed to make a statement and sat in a position similar to the one in question. It was his normal sitting position. At this interrogation it is more likely that he was silent in order to discover what the police found out from Benita and what kind of a deal he could make. When he did speak, he chose to talk with Sorensen, an officer with whom he had previously discussed the case and a man he had known from prior encounters with the law.

The technique of interrogation used here was not threatening, coercive, or promising. Officer Peschong used what is called an "alibi" approach, in which the officer suggests that the killing might have been an accident. This "sympathetic" approach does not amount to coercion. See *Miller v. Fenton*, 741 F.2d 1456 (3d Cir. 1984). The totality of the circumstance does not suggest that the defendant revoked his waiver or that he was coerced into giving his statement.

The defendant next challenges the composition of the jury at trial. He claims there was a systematic exclusion of persons between the ages of 19 and 34 sufficient to deny him his right to a fair jury trial. The defendant failed to prove such a systematic exclusion. This assignment of error is without sufficient support on the record.

The U.S. Supreme Court in *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), set forth what a defendant must prove in order to show a prima facie violation of his sixth amendment right to a jury pool representing a fair cross section of the community.

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364.

To show the group is distinct the defendant must show that (1) the group is limited by some factor, such as race or age, (2) the group has a basic similarity in attitudes, ideas, or experience, and (3) there is a community of interest among members of the group requiring representation in the jury selection process. *Willis v. Zant*, 720 F.2d 1212 (11th Cir. 1983).

Here, the defendant failed to show any similarity between the members of the group in question other than age. Even the defendant's expert witnesses testified that within this age group there can be wide differences in attitudes, income, and interests. Age by itself is insufficient to establish a group as distinctive. "[T]here is no cognizable 'magic' about a group whose sole identifiable characteristic is that each member is in the age range of 18-34." *United States v. Potter*, 552 F.2d 901, 905 (9th Cir. 1977); *United States v. Ross*, 468 F.2d 1213 (9th Cir. 1972), *cert. denied* 410 U.S. 989, 93 S. Ct. 1500, 36 L. Ed. 2d 188 (1973).

Secondly, there was insufficient proof to establish that this group was not fairly represented in the jury venires. The defendant relied solely on the results of the 1980 census for his contention that 49 percent of the eligible jury population in Lancaster County was between 19 and 34.

A U.S. census report does not provide an accurate accounting of the number of residents in a given county. See, *State v. Davis*, 66 Neb. 333, 92 N.W. 740 (1902); *Gordon v. Lowry*, 116 Neb. 359, 217 N.W. 610 (1928). The testimony established that, basically, census packets are mailed to where people are living at the time, without close scrutiny as to whether an individual might be counted at another location. Tracking university students is particularly difficult, since a student may be counted in group housing on campus and also at his parents' residence.

The degree of underrepresentation on a jury panel cannot be measured by census data alone. Without more, the defendant has failed to establish a clear case of unfair representation.

Finally, the defendant failed to show a systematic exclusion of 19- to 34-year-olds in the jury selection process. Essentially, he is challenging the validity of using voter registration key numbers as the basis for jury selection.

He argues that the situation is analogous to *Taylor v. Louisiana*, 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975), and *Duren v. Missouri, supra*, in which state statutes allowed women to be excluded from jury selection upon request. The statutes were found to be unconstitutional for violating the fair cross section requirement of the sixth amendment. The defendant claims that the Nebraska system similarly results in systematic exclusion by limiting jury selection to the names of registered voters. Such tests have been shown to exclude a wide range of individuals, including young people between the ages of 19 and 34.

However, the situations are distinguishable. As pointed out by this court in *State v. Addison*, 198 Neb. 442, 443, 253 N.W.2d 165, 166 (1977):

> The Nebraska statute does not authorize the exclusion of any class from the jury list; the only exclusion is of persons found individually not to have the qualifications of jurors, and the jury commissioner is required to record all names so stricken, such list being subject to inspection by the court and by the attorneys of record. § 25-1629, R.R.S. 1943. The Nebraska system is clearly outside the ambit of Taylor v. Louisiana, *supra*.

See, also, *State v. Wounded Arrow*, 207 Neb. 544, 300 N.W.2d 19 (1980). The failure of young people to register to vote does not amount to a systematic exclusion of young people from jury venires in the context of *Taylor* or *Duren*.

Defendant next challenges the constitutionality of Nebraska's felony murder law, Neb. Rev. Stat. § 28-303 (Reissue 1979), as allowing disproportionately harsh sentences of death or life imprisonment to be imposed upon a defendant who did not kill or have the intent to kill.

This court's opinion in *State v. Bradley*, 210 Neb. 882, 317 N.W.2d 99 (1982), is dispositive. *Bradley* established that there need not be an intent to kill in felony murder, only an intent to commit the underlying felony. " 'The turpitude involved in the robbery takes the place of intent to kill . . . .' " *Id*. at 884, 317 N.W.2d at 101.

Felony murder is not on the same footing with other forms of first degree murder. Willfulness, deliberation, and

premeditation are irrelevant considerations. " 'In [felony murder] it is the particular *actus reus*, the . . . means of the murder, which we have singled out for our gravest criminal sanction and not a particular *mens rea*. . . .' " *Id*. at 885, 317 N.W.2d at 101, quoting *Evans v. State*, 28 Md. App. 640, 349 A.2d 300 (1975).

The defendant admitted he intended to rob Eno and that he and Walter Bradford joined in a concerted effort to rob Eno. They jointly assaulted Eno and, together, drove him to a rural area where he was brutalized before being killed. The defendant watched Walter stab Eno and then returned to Lincoln with Walter in Eno's car. The defendant then tried to conceal the crime.

In the present case the defendant carried out the robbery with the help of Walter Bradford. It is this *actus reus* which is punished by felony murder. Life imprisonment was not a harsh sentence for a robbery which culminated in a brutal murder. The felony murder law is not unconstitutional on this basis.

Finally, the defendant challenges the trial court's refusal to instruct the jury on duress as a defense, and the giving of instruction No. 10 as to the elements of felony murder.

The trial court did not err in refusing to instruct as to duress. As established in *State v. Fuller*, 203 Neb. 233, 278 N.W.2d 756 (1979), *supp. op.* 204 Neb. 196, 281 N.W.2d 749, duress is not a defense to a charge of homicide.

The defendant claims instruction No. 10 was erroneous in that it did not require there be a causal connection between the robbery and murder for felony murder to occur.

Instruction No. 10 provided:

A defendant who is engaged in the perpetration of a robbery or attempted robbery who has knowledge that another has actively joined in such defendant's criminal enterprise and who continues to participate in the robbery or attempted robbery in any degree cannot escape responsibility for a homicide which occurs during the course of the robbery or attempted robbery because as a result either of fear or even of a better motive he concludes to desist from further participation or flee prior to the consummation of the robbery or attempted robbery.

The defendant claims instruction No. 10 did not clearly require that the murder had occurred within the res gestae of the crime.

Jury instructions must be read as a whole. If they fairly present the law so that the jury could not be misled, there is no prejudicial error. *Kresha v. Kresha*, 216 Neb. 377, 344 N.W.2d 906 (1984).

Instruction No. 10 as written was sufficient to establish that the murder must flow from the course of the robbery. Any concern that it did not adequately express that the murder must occur during the res gestae of the robbery is dispelled by instruction No. 12, which provided in part:

> You are instructed that in order to establish that a homicide was committed in the perpetration of or attempt to perpetrate a robbery it is not necessary for the State to prove that the homicide was committed before or during the actual perpetration of or attempted perpetration of a robbery; *a homicide is committed in the perpetration of or attempt to perpetrate a robbery if it is committed in the res gestae of the perpetration of or attempted perpetration of a robbery; that is, if the initial crime of perpetration or of attempt to perpetrate a robbery and the homicide were closely connected in point of time, place and causal relation, and were parts of one continuous transaction.*

(Emphasis supplied.)

When read together, the instructions given fairly stated the elements of felony murder.

There being no error, the judgment is affirmed.

AFFIRMED.