**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Wayne WOODS, Defendant and Appellant.**

**No. 14536.**

Supreme Court of South Dakota.

Argued Jan. 10, 1985.

Decided Sept. 4, 1985.

Rehearing Denied Oct. 15, 1985.

Clair B. Ledbetter, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Kenn A. Pugh of Northern Hills Public Defenders' Office, Deadwood, for defendant and appellant; Marie E. Clark of Northern Hills Public Defenders' Office, Deadwood, on brief.

HENDERSON, Justice.

## ACTION

This is an appeal from a final Judgment of Conviction of Murder in the First Degree. We affirm.

## FACTS

On November 7, 1983, at 12:00 p.m., Wayne Woods, appellant-defendant herein, burglarized the home of James Everett in rural Lawrence County and stole several items including three rifles and a pistol. Woods then left Everett's home and returned to Rapid City where he met his friend Ruben Garcia. Garcia was fourteen years old and on juvenile probation for burglary. The two then decided to burglarize Everett's home again. The pair arrived at Everett's at 5:00 p.m. At this point in the scenario, the testimony becomes conflicting. Deputy Nels Juso of the Lawrence County Sheriff's Office testified that Woods stated that both of them entered the house and were in a bedroom when they saw headlights and heard a car approaching. Juso testified that Woods said the pair then ran out the front door and into some trees behind the house from where they watched Everett. Woods further told Juso that Everett initially surveyed the losses inside the house, then examined Woods' car license plates and returned to the house. Deputy Juso further testified that Woods said he knew Everett and that he approached the back door of the house for the purpose of apologizing to Everett for burglarizing his home. Woods told Juso that he entered the back door and saw Everett coming around a corner in a crouched position and pointing a gun at him. According to Woods' story to Juso, Woods attempted to

say "Jim" and then Woods pulled out a revolver and fired once at Everett.

Garcia, however, testified at trial that only Woods entered the Everett house and when the car approached, he ran to the trees and was joined there by Woods. As Everett examined his losses, Garcia said they made plans. Garcia offered, "Let's get in the car and take off," to which Woods replied, "No, he's already got my license number." Woods then said, "Well, I don't want to get caught so we're going to have to shoot him." Woods asked Garcia if he would like to shoot Everett and when Garcia said he could not, Woods said, "Well, I'm going to have to do it." Woods then approached the back door, peeked through the window, and waited for Everett with his gun drawn. Garcia testified that Woods then swung the door open, stepped in, and fired. This shot ended the life of James Everett.

It is not in dispute that the pair then fled the scene in Woods' car and while returning to Rapid City, wrecked the vehicle and continued on foot before calling for a ride. Later that same night, Woods reported his car stolen.

On November 18, 1983, Woods was taken into custody and interrogated at the Pennington County Sheriff's Department by Pennington County and Lawrence County Deputies. During the course of the interrogations, Woods made certain incriminating statements and consented in writing to the search of his home and car which led to the discovery of the murder weapon.

On February 17, 1984, a jury found Woods guilty of First-Degree Murder. Woods did not take the stand in his defense during the trial. Woods was sentenced to life in prison and it is from his conviction of First-Degree Murder that Woods now appeals.

DECISION

I.

DID THE TRIAL COURT ERR BY REFUSING TO INSTRUCT THE JURY AS TO FIRST– AND SECOND–DEGREE MANSLAUGHTER? WE HOLD THAT IT DID NOT.

Before a South Dakota trial court can instruct the jury as to lesser-included offenses, two separate tests must be met. First, the legal test requires:

(1) [T]he elements of the included offense must be fewer in number than the elements of the greater offense, (2) the penalty for the included offense must be less than the greater charged offense, and (3) the two offenses must contain common elements so that the included offense must be such that the greater offense cannot be committed without also committing the lesser. *State v. Kafka,* 264 N.W.2d 702, 705 (S.D.1978) (Zastrow, J., concurring specially).

*State v. Oien,* 302 N.W.2d 807, 809 (S.D. 1981). Second, the factual test must be met and it requires:

"Where a request has been made to charge the jury on a lesser-included offense, the duty of the trial judge is determined by the evidence. If evidence has been presented which would support a conviction of a lesser charge, refusal to give the requested instruction would be reversible error.... There must be sufficient evidence, however, when read in the light most favorable to the defendant, which would justify a jury in concluding that the greater offense was not committed and that a lesser offense was, in fact, committed."

*Oien,* 302 N.W.2d at 809 (citation omitted).

It is no longer the law in South Dakota that in all murder trials, the trial court must automatically instruct the jury as to all lesser degrees of homicide. *See State v. Waff,* 373 N.W.2d 18, 21–23 (S.D. 1985). If the evidence does not admit or support an instruction on a lesser degree of homicide, the trial court need not give it. *Waff.* The development of the law and sound reasoning has led to this result;

thus, past cases which have expressed contradictory views have been overruled.[1]

■ Under the factual test outlined above, the trial court's duty to instruct as to lesser-included offenses "is determined by the evidence. If evidence has been presented which would support a conviction of a lesser charge, refusal to give the requested instruction would be reversible error." *Oien,* 302 N.W.2d at 809 (citation omitted). Appellant Woods argues that both the legal and the factual tests have been satisfied. In support of his contention that evidence was presented which would have supported a manslaughter conviction and thus the factual test has been met, appellant points to the testimony of Lawrence County Deputy Sheriff Nels Juso.[2]

Deputy Juso testified that Woods indicated that he approached the house to apologize to the decedent and that he shot in self-defense or out of instinct when he saw decedent pointing a gun at him. Appellant contends that this evidence would support a conviction of manslaughter in that the jury could interpret it to be reckless conduct or the use of a dangerous weapon without a premeditated design to effect death and therefore the trial court's refusal to instruct as to manslaughter constituted reversible error.

The State, in contravention, argues that Deputy Juso's recollection of Woods' ever-changing version of Everett's death is simply not sufficient evidence, or not enough evidence, even when read in the light most favorable to the defendant, to justify a jury in concluding that manslaughter was committed instead of first-degree murder. Upon his arrest, Woods initially denied having anything to do with Everett's death and then came up with his self-defense/apology story after realizing Garcia had also been interrogated.

■ Garcia, however, testified that Woods rejected the idea of knocking Everett out, which Garcia suggested, because Everett would still remember the license plate number and that Woods then said, "Well, I don't want to get caught so we're going to have to shoot him." Woods thereupon asked Garcia if he wanted to shoot him and when Garcia said no, Woods said, "Well, I'm going to have to do it." Garcia testified that Woods then approached the house with his gun drawn and peeked through the windows and eventually entered the house and fired the shot that killed Everett. The State argues that the evidence, taken as a whole, showed that appellant Woods had the intent to kill and that Deputy Juso's testimony concerning Woods' statement was insufficient evidence to instruct the jury on manslaughter. With the State's contentions, we agree.

■ The trial court does not have to instruct on matters not supported or warranted by the evidence. *State v. Fender,* 358 N.W.2d 248, 252 (S.D.1984); *State v. Huber,* 356 N.W.2d 468, 472 (S.D.1984); *Miller v. State,* 338 N.W.2d 673, 676 (S.D. 1983); *State v. Chamley,* 310 N.W.2d 153, 155 (S.D.1981); *Oien,* 302 N.W.2d at 809; *State v. Curtis,* 298 N.W.2d 807, 810 (S.D. 1980); *State v. Wilson,* 297 N.W.2d 477, 482 (S.D.1980); *State v. Feuillerat,* 292 N.W.2d 326, 334 (S.D.1980); and *State v. Bean,* 265 N.W.2d 886, 891 (S.D.1978). As stated above, this applies in homicide cases and if the evidence does not admit or support an instruction on a lesser degree of homicide, the trial court need not give it.

1. See *Waff,* 373 N.W.2d at 22, which overruled inconsistent views expressed in *State v. Hubbard,* 20 S.D. 148, 104 N.W. 1120 (1905); *State v. Stumbaugh,* 28 S.D. 50, 132 N.W. 666 (1911); *State v. Godlasky,* 47 S.D. 36, 195 N.W. 832 (1923); *State v. Painter,* 70 S.D. 277, 17 N.W.2d 12 (1944); *State v. Violett,* 79 S.D. 292, 111 N.W.2d 598 (1961); *State v. Zobel,* 81 S.D. 260, 134 N.W.2d 101 (1965); *State v. Grooms,* 85 S.D. 532, 186 N.W.2d 889 (1971); *State v. Lewis,* 90 S.D. 615, 244 N.W.2d 307 (1976); *State v. Vas-* sar, 279 N.W.2d 678 (S.D.1979); and *State v. Lohnes,* 324 N.W.2d 409 (S.D.1982).

2. This case was argued on January 10, 1985. Although this was seven months before the rendition of our decision in *Waff,* counsel for appellant, apparently foreseeing our reasoning, argued in the alternative that the dictates of the legal and factual tests of *State v. Kafka,* 264 N.W.2d 702 (S.D.1978), and *Oien,* had been met in this case.

*Waff.* Here, construing the facts most favorably toward appellant, we are not convinced that sufficient evidence was presented which would justify a jury in concluding that murder was not committed and that manslaughter was committed. We therefore conclude that a manslaughter instruction was properly refused by the trial court.

## II.

DID THE TRIAL COURT ERR BY REFUSING TO INSTRUCT THE JURY ON JUSTIFIABLE HOMICIDE? WE HOLD THAT IT DID NOT.

■ "Homicide is justifiable when committed by any person in the *lawful defense* of such person ... when there is reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished." SDCL 22–16–35 (emphasis supplied). The trial court, however, need not instruct on self-defense, excusable homicide, or justifiable homicide, if the evidence does not support an instruction thereon. *See State v. Huber,* 356 N.W.2d at 473–74; *State v. Zemina,* 87 S.D. 291, 299–300, 206 N.W.2d 819, 823 (1973); and *State v. Johnson,* 81 S.D. 600, 608, 139 N.W.2d 232, 237 (1965). Upon a review of the record herein, we find no support for a justifiable homicide instruction.

■ Appellant Woods was a gun-wielding burglar who entered Everett's house not once—but twice—to steal therefrom. It is therefore beyond contention that Woods was the aggressor. Generally, the aggressor, or the one who produces the circumstances which make it necessary to take another's life, is not entitled to assert self-defense. *See* 40 Am.Jur.2d *Homicide* § 145 (1968); LaFave & Scott, *Handbook on Criminal Law,* ch. 5, § 53, at 394–95 (1972); and 1 Anderson, *Wharton's Criminal Law and Procedure,* §§ 228, 229, at 499–503 (1957). When Everett surprisingly

returned and Woods ran from the home, the burglary was not over and Woods was not suddenly restored to his pre-aggression right of self-defense. Everett, upon discovering the burglary and the strange vehicle parked outside, was under the reasonable presumption that a burglar was still on or near the premises. Therefore, if the evidence reflected that Everett used any force to repel the felonious intruder, this would have been lawful force, and would not give rise to a self-defense defense by the intruder. SDCL 22–16–34.

■ Woods, the burglar, who could have driven his car away after Everett returned, can hardly claim danger to himself by remaining on the premises and stalking the homeowner by peering through the window—waiting for the opportunity to kill. Appellant wishes to elevate himself, in law, to a self-defense status such as that belonging to Everett. This cannot be. The trial court's refusal to instruct on justifiable homicide was not in error.

## III.

DID THE TRIAL COURT ERR BY REFUSING TO SUPPRESS WOODS' INCRIMINATING STATEMENTS AND THE EVIDENCE OBTAINED IN THE CONSENT SEARCH? WE HOLD THAT IT DID NOT.

On November 18, 1983, at 7:00 p.m., appellant Woods was taken into custody and interrogated at the Pennington County Sheriff's Department by Pennington County and Lawrence County Deputies. Woods was read the *Miranda* warnings. He said he understood his rights and signed the *Miranda* card. When asked whether or not he wished to waive his rights and talk to the officers, appellant said he would talk to them.[3] This first interrogation session began at 7:00 p.m. and lasted until 8:45 p.m.

---

**3.** Woods never requested the assistance of counsel and this is not raised as an issue in the briefs.

During this first session, Woods denied involvement in the Everett case and said he had been at a friend's house during the time of the murder. When told by the interrogating officers that all they wanted is for appellant to tell the truth, Woods replied, "I've said everything I'm gonna say." Moments later, he was again told that this was his opportunity to tell his side of the story and that he would not have a second chance. Woods responded, "I don't have anything to say." When asked if he wanted to say some more about what happened, Woods said "No." Further, when asked again if he wanted to say anything more or add to his story, Woods responded that he did not "Because my story is what I already told you." After each of the above responses, the interrogation continued. During this first session, Woods also said that he had previously taken five times the recommended dosage of an over-the-counter sinus medicine. During this first interrogation, appellant made no incriminating statements; the thrust of his statements was that he had an alibi defense, i.e., he was at a friend's house at the time of the murder.

At 8:45 p.m., the first interrogation session ended and a polygraph examination was administered. This polygraph examination continued until 11:00 p.m., when a second interrogation session began.[4] Prior to this second interrogation, Woods was asked if he still knew his *Miranda* rights and he said that he did. When asked if he wanted his rights read to him again, he stated no. This second session lasted until 11:36 p.m. During this second interrogation, Woods made incriminating statements and signed a consent to search form which led to the discovery of the murder weapon. A third interrogation session was conducted the next day which also produced incriminating statements.

Woods moved to suppress the statements and the evidence but the trial court denied the motion. In its Findings of Fact, Con-

clusions of Law, and Order, dated February 10, 1984, the trial court specifically found, inter alia, that appellant was advised of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); that he knowingly, intelligently, and voluntarily waived his right to counsel and to make statements; that, thusly, appellant did not exercise his right to remain silent and did not end his statements; that appellant voluntarily consented to the search; and that the State had established these facts beyond a reasonable doubt.

Appellant contends the trial court erred in failing to suppress the incriminating statements and the evidence for two reasons. First, appellant asserts that his statements in the first interrogation session were statements exercising his right to remain silent, and since the officers failed to honor the exercise of that right, anything obtained thereafter was obtained in violation of his constitutional rights. Second, appellant argues that his consent to the search was not voluntary and was procured in violation of his right to remain silent. Woods maintains that his written consent to search was not voluntary because it was given when the interrogation had become heated; while he had taken excess sinus medicine; and after four and one-half hours of police interrogation.

■ We initially note that a trial court's findings resulting from a suppression hearing will be upheld unless clearly erroneous, *State v. West*, 344 N.W.2d 502, 504–05 (S.D.1984), and that our function under that standard is to determine whether the findings are clearly against the weight of the testimony. *State v. Johnson*, 320 N.W.2d 142, 147 (S.D.1982).

■ Although "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored[,]'" *Michigan v. Mosley*, 423 U.S.

---

**4.** No polygraph testimony was elicited; no legal issues are posed by the briefs concerning a

polygraph examination.

96,104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975), the important question herein is whether appellant invoked his constitutional right to remain silent.

During the suppression hearing, two of the interrogating officers testified that appellant said he would talk to them and that at no time did appellant express a desire to terminate the conversation and quit talking. When confronted by defense counsel with the statements by Woods, as outlined above, the officers testified that they did not interpret these to mean that appellant wanted to quit talking or that he was invoking his right to remain silent. Both officers further testified that they understood these statements to mean that appellant was going to stick to his previous explanation and was not going to change his story, i.e., his alibi of being at a friend's house. It was stated that these conclusions were reached based on the course of the conversation and appellant's facial expressions. No evidence refuting the officers' testimony was presented.

■■■■■ Facially, appellant's statements are, at best, ambiguous. This case, like the case of *State v. Hicks*, 133 Ariz. 64, 74, 649 P.2d 267, 277 (1982), "is a case where appellant did not clearly invoke his right to remain silent...." When examined in the context of the interrogating officers' inquiring statements as reflected by the record, it is reasonably concluded that appellant's statements were only intended to evince a persistence in an alibi and not to cut off questioning. In essence, after stating his alibi, the officers would ask appellant if he was going to tell them the truth and appellant would respond that he had already told them his story. The interrogating officers' testimony supports this conclusion, and we agree with the trial court that appellant Woods did not exercise his right to remain silent. When a suspect is asserting an alibi, he is not remaining silent. He is doing the opposite; he is talking. There is no talismanic word or phrase with which to invoke the right to remain silent, and the *Miranda* safeguards must be applied with "flexibility and real-

ism." *United States v. Rodriguez-Gastelum*, 569 F.2d 482, 486 (9th Cir.1978), *cert. denied*, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978). A literal interpretation of *Miranda* has been rejected because it would lead to "absurd and unintended results." *Mosley*, 423 U.S. at 102, 96 S.Ct. at 326, 46 L.Ed.2d at 320.

> [A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, *regardless of the circumstances*, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.

*Id.* (emphasis supplied). In his concurring opinion in *Mosley*, Justice Byron White also warned against a paternalistic interpretation of the *Miranda* safeguards so as not to "imprison a man in his privileges," 423 U.S. at 109, 96 S.Ct. at 329, 46 L.Ed.2d at 324, and thus cut off the suspect's "ability to explain a particular incriminating fact or to supply an alibi for a particular time period [which] would result in his immediate release." *Id.* at n. 1. "*Miranda* should not be read so strictly as to require the police to accept as conclusive any statement or act, no matter how ambiguous, as a sign that the suspect desires to cut off questioning." *State v. Perkins*, 219 Neb. 491, 495, 364 N.W.2d 20, 24 (1985). *See also, Vail v. State*, 599 P.2d 1371 (Alaska 1979); *People v. Roark*, 643 P.2d 756, 775 (Colo.1982) (Erickson, J., concurring in part and dissenting in part); *State v. House*, 54 Ohio St.2d 297, 376 N.E.2d 588 (1978); and *Lamb v. Commonwealth*, 217 Va. 307, 227 S.E.2d 737 (1976).

■■■■ We have carefully reviewed the Findings of Fact and Conclusions of Law entered by the trial court and determine that they are not clearly erroneous. *West*, 344 N.W.2d at 504–05; *Johnson*, 320 N.W.2d at 147.

■■■■ As for appellant's contention concerning the voluntariness of his written

consent to search, we find it to be without merit.

Voluntariness is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).... The state must establish voluntariness by clear and convincing evidence that the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied. *State v. Kissner,* 252 N.W.2d 330 (S.D.1977); *Gautreaux v. State,* 52 Wis.2d 489, 190 N.W.2d 542 (1971).

*State v. Cody,* 293 N.W.2d 440, 450 (S.D. 1980). Here, we find no credible evidence against the trial court's determination that appellant's consent to the search was voluntary. Appellant was not threatened or coerced, actual or implied. He voluntarily signed a consent form to search his automobile and room. The first interrogation lasted approximately one hour and 45 minutes; the second interrogation lasted approximately 36 minutes. Appellant was permitted breaks to stretch himself. We cannot read a browbeating into this factual scenario or a psychological rubber hosing. There is no suggestion that appellant was physically exhausted or medicinally drained and overcome from nonprescription medicine. Rather, he appeared alert.

The judgment appealed from is affirmed.

WOLLMAN and MORGAN, JJ., and WUEST, Circuit Judge, Acting as Supreme Court Justice, concur.

FOSHEIM, C.J., dissents.

FOSHEIM, Chief Justice (dissenting).

The jury should have been given the instructions on first and second degree manslaughter requested by Defendant-Wood. By statute, the jury must find the degree of the crime of which a defendant is found guilty. SDCL 23A–26–7. Since murder and manslaughter, and their subdivisions, are by statute all degrees of criminal homicide, the jury must be so instruct-

ed. *See State v. Waff,* 373 N.W.2d 18, (S.D.1985) (Fosheim, C.J., dissenting).