Brian Keith **PERKINS**, Petitioner,

v.

Gary E. **GRAMMER**, Warden, Nebraska State Penitentiary, Respondent.

No. CV 85–L–569.

United States District Court,
D. Nebraska.

Jan. 8, 1987.

William M. Berlowitz, Lincoln, Neb. (Court-appointed), for petitioner.

Robert M. Spire, Atty. Gen. and Calvin D. Hansen, Asst. Atty. Gen., Lincoln, Neb., for respondent.

## MEMORANDUM

LAY, Circuit Judge, Sitting by Special Designation.

Brian Keith Perkins, a Nebraska state prisoner, brings this habeas corpus petition under 28 U.S.C. § 2254 alleging errors relating to his conviction in the Nebraska courts. Perkins was found guilty of first-degree murder and sentenced to life imprisonment for his part in a robbery-murder. Perkins alleges four grounds for error in his petition for a writ of habeas corpus. He asserts the following: 1) his silence during questioning constituted a revocation of his waiver of his constitutional right to remain silent; 2) the composition of the jury pool resulted in the unconstitutional exclusion of 18–34 year olds; 3) Nebraska's felony murder rule is unconstitutional; and 4) the use of jury instruction No. 10 resulted in the denial of a fair trial. There is no issue of exhaustion of remedies as the petitioner properly raised these issues in the trial court and on appeal. *State v. Perkins,* 219 Neb. 491, 364 N.W.2d 20 (1985).

The general facts resulting in the petitioner's conviction are included for clarification. Perkins lived with Benita Bradford. Benita arranged to pay her past due rent to her landlord, Gordon Robert Eno, and Perkins heard of these arrangements. When Eno arrived that evening, Perkins borrowed a scarf and took a kitchen knife from Benita and hid in the bushes. As Eno was leaving, Walter Bradford arrived and discussed with Eno the possibility of a job. An argument ensued, and Eno walked away.

As Eno walked to his car, Perkins jumped him from behind. Eno pushed him to the ground, at which point Walter attacked Eno and knocked him down.[1] Perkins told Eno it was a robbery and held him while Walter hit and kicked Eno and searched his pockets for money. When Eno's wallet did not contain the money Perkins hoped for, Perkins began searching for Eno's briefcase. Perkins claimed that Walter then stabbed Eno with the knife Perkins had taken. An eye witness testified that a man with a scarf did the stabbing; and Perkins had stated that he was the only one wearing a scarf over his face.

Perkins and Walter placed Eno in his own car, drove him to the country, and dragged him into a ditch. Although Perkins claimed that he only cooperated because Walter threatened him with the knife, Perkins did not utilize any of several opportunities to escape. Perkins watched as Walter slit Eno's throat. The petitioner and Walter returned to Lincoln in Eno's car. Later that night, bleach was poured on the interior of the car and in the area where the original struggle had occurred in an effort to obliterate any clues. Perkins was arrested three days later.

## I. Silence After a Waiver of the Right to Remain Silent

The interrogating officer told Perkins that he had a warrant for his arrest for some misdemeanor bicycle offenses, and that he also wanted to talk to him about Robert Eno's death. Perkins said, "Who is Mr. Eno?" Whereupon the officer read him his *Miranda* rights. The petitioner orally assented to an understanding of each of his rights, and to waive his rights. He then signed a statement to that effect.

As the officer began questioning him about Eno's death, Perkins slouched back in his chair, folded his arms, and closed his eyes. After about five minutes, Perkins again said, "Who is Mr. Eno?" Other than these two statements, Perkins sat quietly. The officer posed questions to Perkins for about half an hour, without any further comment by Perkins. He then played a taped statement of Benita Bradford's. After that, Perkins asked to see Officer Sorensen, with whom he had had prior dealings.

The petitioner told Sorensen that he did not kill Eno. At his request, the petitioner was allowed to talk to Benita. After Benita left, Perkins made an incriminating statement to Officer Sorensen.[2] Perkins had established a relationship with Officer Sorensen from his prior arrests, and from his work with Officer Sorensen concerning an inmate.

---

1. Although the Supreme Court of Nebraska states that it was Walter who made the initial attack, this statement is unsupported by the record. *Perkins, supra,* 219 Neb. at 492, 364 N.W.2d at 22. The uncontroverted testimony of Perkins at trial established that he first attacked Eno in furtherance of his plan to rob Eno. Perkins stated that he alone planned to rob Eno, and that Walter was not involved in any such plan.

2. At trial, Officer Sorensen, testified to the following:

At that point I asked Detective Peschong to go into the interview room with Brian Perkins with me. We both entered the room and sat down and at that point Brian said that he didn't want Peschong in here. Jim started to say something to him and Brian said I don't want Peschong in here and Jim got up and left the interview room leaving Brian and I alone. At that point Brian said to me it just started out to be a little old robbery, man, and then he stopped and he said don't you want to tape record this and I said do you want it tape recorded? He said, yes. So Brian and I both got up from the holding room area and we went to the conference room where a tape recorder was obtained and a statement was then set up and taken from Brian Perkins. XII Testimony 2598.

The petitioner asserts that his silence following his oral and written waivers constituted a revocation of the waivers, making the taped statement inadmissible. In analyzing whether a waiver of rights was voluntarily, knowingly and intelligently made, an examination must be made of the totality of the circumstances. *Lamp v. Farrier*, 763 F.2d 994, 997 (8th Cir.), *cert. denied*, 474 U.S. 1009, 106 S.Ct. 534, 88 L.Ed.2d 465 (1985) (facts demonstrated waiver of right to silence and right to attorney after phone calls to attorney). "[W]aivers * * * must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) (citations omitted) (interrogation at instance of authorities, and confession, without requested attorney, was not a waiver). The "totality of the circumstances" approach should also be applied to an analysis of subsequent revocations of waivers of rights.[3]

The petitioner was familiar with arrest procedures. He was capable of understanding his rights and articulating a waiver of those rights. The actions of the interrogating officers were not intimidating to Perkins; in fact, officer Peschong stated that he was attempting to alleviate the petitioner's possible fears. Under the facts of this case, this petitioner was capable of stating that he did not wish to make a statement, if that was his intention. The trial court's admission of the taped statements was not error.

## II. Propriety of Jury Pool Selection

The petitioner next asserts that the system of jury selection violated his constitutional rights. For a prima facie violation, the petitioner must demonstrate the following: (1) the exclusion involved a distinctive group; (2) there is not a reasonable relation to that population in the community; and (3) the jury selection process constitutes a systematic exclusion, resulting in the underrepresentation of the group. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Euell v. Wyrick*, 714 F.2d 821, 822 (8th Cir.1983) (per curiam). The record demonstrates that only 32.8% of the jury panel was composed of persons aged 18–34, whereas the same age group comprised 49% of those of voting age in Lancaster County in the 1980 Census. Therefore, the underrepresentation on the jury panel was 34% of that in the county.[4]

3. Although no succinct statement to this effect can be found, this approach has been applied to asserted revocations. *See United States v. Johnson*, 529 F.2d 581 (8th Cir.), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2233, 48 L.Ed.2d 835 (1976); *United States v. Ford*, 563 F.2d 1366 (9th Cir. 1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978). In *Johnson*, the defendant received his *Miranda* warnings, and signed a statement to that effect. However, he refused to sign a waiver of those rights. Despite this refusal to execute the waiver, the defendant thereafter answered questions posed by the officers. "The defendant did not * * * rebut the government's version of the circumstances surrounding the statement, and the defendant has never contended that the agents in any improper way induced him to talk after the warnings were given. Further, the defendant did sign a form indicating that he had received and understood those warnings." *Johnson, supra*, 529 F.2d at 584. In *Ford*, the court found that the defendant had been treated courteously, and that her rights had been given to her in both English and Thai, her native language. She waived those rights, but during questioning there were "intermittent silences in response to certain questions." *Ford, supra*, 563 F.2d at 1366–67. The court held those facts insufficient to revoke her earlier waiver of her rights.

4. There are two methods used by the courts to determine the amount of disparity in jury populations: absolute disparity and comparative disparity. *See United States v. Clifford*, 640 F.2d 150, 155–56 (8th Cir.1981). Absolute disparity is the difference between the percentage in the population and the percentage in the jury pool. Here, this calculation would be: $49\% - 32.4\% = 16.6\%$. To calculate the comparative disparity, the absolute disparity is divided by the percentage in the population and multiplied by 100. In this case, the calculation would be: 16.6% divided by $49\% \times 100 = 33.9\%$. This would demonstrate a 33.9% underrepresentation.

In *Clifford*, the United States Court of Appeals for the Eighth Circuit was confronted with asserted underrepresentation of Indians in the ve-

Although the Supreme Court in *Duren* did not set a particular guideline as to unconstitutional underrepresentation, subsequent cases provide assistance. In *Duren*, women were underrepresented by more than 70% as compared to the population. *Duren, supra,* 439 U.S. at 359–60, 99 S.Ct. at 666. The petitioner cites two cases in the First Circuit Court of Appeals as support for his claim. *LaRoche v. Perrin,* 718 F.2d 500 (1st Cir.1983); *United States v. Butera,* 420 F.2d 564 (1st Cir.1970). In *LaRoche,* the underrepresentation was 72% of the population. *LaRoche, supra,* 718 F.2d at 502. In *Butera,* the underrepresentation was 73% of that in the population. However, the Eighth Circuit has held that underrepresentation on the petit jury panel of 46% of that in the general population was not sufficient to rise to the level of a constitutional violation. *United States v. Clifford,* 640 F.2d 150, 154–55 (8th Cir.1981).[5] Thus, the trial court did not err in denying petitioner's motion for a mistrial. Because the petitioner failed to demonstrate substantial underrepresentation, the other factors set forth in *Duren* need not be considered.

### III. Constitutionality of Felony Murder Statute

The petitioner asserts that the Nebraska statute governing felony murder unconstitutionally permits a harsh sentence for one who does not actually kill another, nor has the intent to kill. The constitutionality of felony murder statutes has been settled by the United States Supreme Court: "That States have authority to make aiders and abettors equally responsible, as a matter of law, with principals, or to enact felony-murder statutes is beyond constitutional challenge." *Lockett v. Ohio,* 438 U.S. 586, 602, 98 S.Ct. 2954, 2963, 57 L.Ed.2d 973 (1978). *See also Moore v. Wyrick,* 766 F.2d 1253, 1255–56 (8th Cir.1985), *cert. denied, Armontrout v. Moore,* —— U.S. ——, 106 S.Ct. 1242, 89 L.Ed.2d 350 (1986).

The petitioner's related assertion that life imprisonment is an improper sentence does not rise to the level of a constitutional challenge. If the Nebraska state legislature wishes to extend the protections provided by the Constitution, they have the power to do so. This claim of the petitioner must also fail.

### IV. Propriety of Jury Instructions

Finally, Perkins asserts that the use of jury instruction No. 10 erroneously permitted the jury to presume a causal connection between the felony and the murder, rather than their having to find such a causal connection. We reject this contention on the ground that the claim fails to raise an issue cognizable in a federal habeas corpus proceeding. This is simply a question of state law over which federal courts do not have jurisdiction to pass.

It is therefore ordered that the petition for writ of habeas corpus is denied.

---

nires. An absolute disparity of 10% was used as a guide for a prima facie showing of substantial underrepresentation. Because the total Indian population was only 15.6%, the appellant argued that it would be virtually impossible to find substantial underrepresentation using absolute disparity. Although the court stated that it declined to adopt comparative disparity in that case, it held that there was no substantial underrepresentation under either method of calculation.

In an earlier case, the Eighth Circuit Court of Appeals alluded to the appropriate use of comparative disparity: "While [comparative disparity] may be proper where blacks constitute a significant proportion of the population, it is ordinarily inappropriate where a very small proportion of the population is black." *United States v. Whitley,* 491 F.2d 1248, 1249 (8th Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974). *Clifford* and *Whitley* concerned minority groups. The group asserted by the petitioner consists of 49% of the population. Although technically a "minority" of the population, this group is the largest possible plurality. In such a situation, the use of absolute disparity overly emphasizes any deviation in venires. Therefore, the appropriate standard in this instance is comparative disparity.

5. Although that case dealt with the alleged underrepresentation of Indians, the factors applied were still those found in *Duren.*